**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
In re:                                              :    Chapter 11
                                                                 :
TRIANGLE USA PETROLEUM                     :    Case No. 16-11566 (___)
CORPORATION, *et al.*,                          :
                                                                 :    (Joint Administration Pending)
                              Debtors.[1]            :
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF JOHN R. CASTELLANO IN SUPPORT OF CHAPTER 11**
**PETITIONS AND FIRST DAY PAPERS**

I, John R. Castellano, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer of Triangle USA Petroleum Corporation ("**TUSA**") and its debtor affiliates (collectively, the "**Debtors**") in these chapter 11 cases (the "**Chapter 11 Cases**").[2] To minimize any business disruption caused by the commencement of these Chapter 11 Cases (as defined below), the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith (collectively, the "**First Day Papers**").[3] I submit this declaration (this "**Declaration**") in support of the Debtors' (a) voluntary

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are: Triangle USA Petroleum Corporation (0717); Foxtrot Resources LLC (6690); Leaf Minerals, LLC (9522); Ranger Fabrication, LLC (6889); Ranger Fabrication Management, LLC (1015); and Ranger Fabrication Management Holdings, LLC (0750). The address of the Debtors' corporate headquarters is 1200 17th Street, Suite 2500, Denver, Colorado 80202.

[2]      TUSA is a direct and wholly owned subsidiary of Triangle Petroleum Corporation ("**TPC**"), the ultimate parent of each of the debtors and debtors in possession in the Chapter 11 Cases and each of their non-Debtor affiliates (the "**Non-Debtor Affiliates**" and, together with TPC and the Debtors, "**Triangle**" or the "**Company**").

[3]      Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Papers.

petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (b) First Day Papers. I am authorized to submit this Declaration on behalf of the Debtors.

2.       I am a managing director of AP Services, LLC, the Company's financial advisor since April 2016. On June 28, 2016, I was appointed Chief Restructuring Officer of TUSA and the other Debtors. As a result of my tenure with the Company, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto. Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions. In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my supervision, at my direction, and for my use in preparing this Declaration.

3.       This Declaration is divided into two parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Papers.

**PART I**

**BACKGROUND**

## I.     Chapter 11 Filings

4.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.      The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the U.S. Trustee. No trustee or examiner has been appointed in the Chapter 11 Cases.

## II.    The Debtors' Businesses

### A.    Introduction

7.      TUSA and its Debtor subsidiaries (collectively, the "**TUSA Debtors**") comprise an independent, growth-oriented oil and gas exploration and development company emphasizing the acquisition and development of unconventional shale oil and natural gas resources in the Williston Basin of North Dakota and Montana. TUSA's corporate parent, TPC, is a vertically integrated, independent energy company with three lines of business. In addition to TUSA's exploration and production ("**E&P**") business, TPC's wholly owned, non-Debtor subsidiary RockPile Energy Services, LLC and its affiliates (collectively, "**RockPile**") provide oilfield services, focusing primarily on hydraulic pressure pumping and complementary services. Finally, TPC's joint venture, Caliber Midstream Partners, L.P., and its affiliates (collectively, "**Caliber**") provide crude oil, natural gas, and fresh and produced water gathering, processing, and transportation services to TUSA and other customers in the Williston Basin. In addition to its three principal business lines, Triangle formerly operated a fabrication enterprise through Debtor

3

Ranger Fabrication, LLC ("**Ranger**") and its subsidiaries (collectively, the "**Ranger Debtors**"). As discussed in greater detail below, Ranger ceased operations in early 2016 and has commenced Chapter 11 Cases alongside its sister companies in order to complete an orderly wind down.

B.    **History**

8.    TPC was founded in 2003 as Peloton Resources Inc.[4] and has been operating as Triangle Petroleum Corporation since 2005. TUSA was incorporated in 2005.[5] Triangle was initially headquartered in Calgary, Alberta, and concentrated on the acquisition and operation of oil and gas interests in Canada. Following a management change in late 2009, Triangle moved its corporate offices to Denver, Colorado, and recentered its business on acquiring non-operating interests in the Williston Basin.

9.    In 2011, Triangle transitioned its focus from non-operating to operating interests in the Williston Basin. Triangle spud its first well in October 2011. Over the next three years, Triangle's business expanded rapidly, bolstered by favorable commodity prices and strong operational performance. TUSA aggressively expanded its footprint by acquiring attractive leasehold interests and related producing properties from Kodiak Oil & Gas, Marathon, and others. Concurrently, Triangle undertook a number of strategic initiatives to develop a strong platform for long-term growth. Recognizing that the relative lack of established oilfield services and midstream businesses in the Williston Basin presented a significant competitive opportunity, Triangle proactively expanded its business to include complementary oilfield services and gathering business lines. Triangle's wholly owned subsidiary, RockPile, and its joint venture,

---

[4]    TPC (then Peloton Resources Inc.) was incorporated as a Nevada corporation; it reincorporated as a Delaware corporation in 2012.

[5]    Ranger Fabrication, LLC was formed as a Delaware corporation in 2014.

Caliber, which provide oilfield services and gathering services, respectively, commenced operations in 2012.

### C.    TUSA's E&P Business

#### (i)    The Williston Basin

10.    As noted, TUSA is a premier, independent E&P operator in the Williston Basin. Spanning approximately 150,000 square miles across the Dakotas, Montana, and southern Canada, the Williston Basin is among the largest shale oil reservoirs in North America. The principal geologic targets in the Williston Basin are the Bakken shale and Three Forks formations, which collectively contain an estimated 7.4 billion barrels of oil, 6.7 trillion cubic feet of natural gas, and 500 million barrels of natural gas liquids.[6]

11.    Although the first Williston Basin well was drilled in 1951, production levels remained modest until the application of horizontal drilling, hydraulic fracturing, and other unconventional techniques to the Middle Bakken shale beginning in the mid-2000s. These techniques precipitated an exponential increase in production, peaking at over 1.2 million barrels per day in 2014 and turning North Dakota into the second largest oil-producing state in the country.

---

[6]    *See* U.S. Geological Survey, Fact Sheet 2013-3013, *Assessment of Undiscovered Oil Resources in the Bakken and Three Forks Formations, Williston Basin Province, Montana, North Dakota, and South Dakota* at 1 (2013).



*See* Drilling Productivity Report, U.S. Energy Information Administration, April 2016

As one of the largest unconventional plays in North America, the Williston Basin is highly

competitive, with dozens of E&P operators—ranging from major integrated operators to small

independent producers—active in the region.

    12.    Oil and gas production in the Williston Basin is constrained by substantial

technical and economic challenges. As noted, successful exploitation of the Bakken shale and

Three Forks formations depends on unconventional and capital intensive exploration and drilling

technologies, including horizontal drilling and hydraulic fracturing. The Williston Basin is

further constrained by limited gathering infrastructure and long-distance pipeline capacity. As a

result, Williston Basin operators rely more heavily on truck and rail transportation for gathering

and interstate takeaway than operators in more mature plays. Owing to these and other factors,

the Williston Basin has relatively high break-even costs and differentials, making it more

susceptible to commodity price fluctuations than more established plays.

            *(ii)*    ***The TUSA Debtors' Oil and Gas Assets***

    13.    The TUSA Debtors' oil and gas interests comprise approximately 3,500 leases

across approximately 230,000 gross (approximately 100,000 net) acres in the Williston Basin,

containing total proved reserves of approximately 47,707 Mboe[7] as of fiscal year end 2016. The TUSA Debtors operate 144 gross producing wells and 74 drilling-space units ("**Units**"), plus 10 drilled but uncompleted wells. In addition, the TUSA Debtors hold non-operating working interests in 355 Units, comprising 529 gross wells and 26 wells on a net basis.

14.    The TUSA Debtors' area of primary strategic focus encompasses approximately 78,000 net acres in McKenzie and Williams Counties, North Dakota, and eastern Roosevelt and Sheridan Counties, Montana, which the TUSA Debtors refer to as their "core acreage." The TUSA Debtors' core acreage has high oil saturation, is slightly over-pressured, and has the potential for multiple productive benches. The TUSA Debtors operate approximately 49,000 net acres (or 63%) of the core acreage.

15.    The TUSA Debtors target the Middle Bakken formation between the Upper and Lower Bakken shales at an approximate vertical depth of 10,300 to 11,300 feet. The TUSA Debtors also target the Three Forks formation, which is present immediately below the Lower Bakken Shale. Figures showing the horizontal and vertical extent of the Bakken and Three Forks formations are set forth below.



Figure 1. Source: US Geological Survey, 2013

---

[7]    "Boe," or "barrel of oil equivalent" is a metric that aggregates hydrocarbons of various types (crude oil, natural gas, etc.) into a single unit of measurement. "Mboe" denotes one thousand Boe. The figure reported here is predicated on pricing assumptions dictated by SEC regulations, which may not accurately reflect the true economic value of the Debtors' petroleum reserves. *See infra* n.14.

16.     The TUSA Debtors exploit these targets using a combination of advanced drilling and completion techniques, including horizontal drilling and hydraulic fracturing. The Debtors have refined these techniques over time, reducing well completion costs and increasing aggregate production per well.

###### (iii)    *Gathering, Transportation, and Processing*

17.     As noted, transportation of produced oil and gas poses significant challenges for Williston Basin operators. Despite the market downturn, production in the Williston Basin continues to exceed long-distance pipeline capacity, forcing some producers to ship produced hydrocarbons by rail, thereby increasing costs. The pipeline take-away deficit has narrowed substantially as production has slowed and new pipelines have come online, but pipeline capacity remains inadequate.

18.     Williston Basin producers face similar logistical challenges in gathering and transporting produced hydrocarbons from the wellhead to intermediate delivery points. Because gathering infrastructure in the Williston Basin remains relatively undeveloped, Williston Basin operators have relied disproportionately on flaring natural gas and trucking crude oil and water.

19.     To alleviate these challenges, in October 2012, Triangle entered into a joint venture with First Reserve Caliber Holdings LLC ("**First Reserve**") to form Caliber and construct a pipeline gathering system to service Triangle and third-party wells in the Williston Basin. The Caliber system provides a suite of gathering services, including crude oil gathering, stabilization, and transportation; natural gas gathering and processing and natural gas liquids takeaway; produced water transportation and disposal; freshwater and maintenance water delivery; and measurement services, storage, and other ancillary offerings. Caliber's infrastructure consists of over 300 miles of gathering pipeline, crude oil stabilization facilities,

long-distance pipeline interconnects, natural gas refrigeration facilities, produced water disposal wells, and other facilities.

20.     Caliber provides gathering services to TUSA pursuant to several long-term midstream services agreements (the "**Caliber Midstream Agreements**").[8] The two most significant of these relate to gathering and related services for crude oil and gas and water (together, the "**Primary MSAs**"). The Primary MSAs provide that Caliber will be the exclusive provider of the applicable midstream services for certain Units operated by TUSA. These Units, most of which are located in and around TUSA's core acreage in McKenzie County, are referred to in the Primary MSAs as the "Dedicated Properties." In addition to the Primary MSAs, TUSA and Caliber are parties to several ancillary agreements for measurement services, natural gas liquids handling, fresh water delivery, and produced water gathering and disposal services.

21.     Finally, under a separate revenue commitment agreement, TUSA agreed to deliver specified minimum monthly revenues to Caliber, irrespective of the volumes of oil, natural gas, produced water, and fresh water actually serviced by Caliber. The cumulative minimum revenue commitment over the 15-year term of the revenue commitment agreement is $405.0 million, of which $293.7 million was outstanding as of April 30, 2016. The revenue commitment agreement permits TUSA to build credits against future monthly commitments equal to the amount by which actual monthly revenues under the Primary MSAs exceed TUSA's minimum monthly revenue commitment. As of April 30, 2016, TUSA had accrued a cumulative credit of $41.5 million. Credits may be carried forward for a period of four years from the date of

---

[8]     Any summary of an agreement in this Declaration is a reference to such agreement as amended, supplemented, or otherwise modified from time to time and is qualified in its entirety by the terms of that agreement.

the accrual. TUSA is required to pay Caliber for any deficiency in actual monthly revenues if no credits are available.

22.     As of fiscal year end 2016, 111 of the TUSA Debtors' 144 operated wells were connected to the Caliber system. Certain of the TUSA Debtors' wells that are not connected to the Caliber system are connected to gathering pipelines owned and operated by other midstream companies.[9] In total, 99% of the TUSA Debtors' operated wells are connected to gas sales; 92% of their operated wells are connected to crude oil gathering and processing systems; 82% of their operated wells are connected to produced water gathering lines; and 80% of their operated wells are connected to freshwater delivery lines.[10]

*(iv)    Oil and Gas Sales*

23.     Produced oil and gas from the TUSA Debtors' operated wells is sold at the wellhead, or a location nearby, under short-term agreements with various purchasers. While the pricing terms of these agreements vary by purchaser, they all reflect a price determined by the current NYMEX West Texas Intermediate contract, less a discount (also known as a "differential") that is either calculated, fixed, or a combination of calculated and fixed. The differential reflects a number of factors, including transportation costs and the physical characteristics of the produced oil. In fiscal year 2016, the TUSA Debtors sold operated well production directly to 11 oil purchasers, two NGL purchasers, and six natural gas purchasers. For the TUSA Debtors' economic interests in wells operated by third-parties—which include a

---

[9]     Unlike Caliber, the TUSA Debtors' other midstream purchasers purchase produced oil and gas at the wellhead. Thus, while the prices these counterparties pay to purchase the TUSA Debtors' oil and gas reflects the midstream services they provide, the TUSA Debtors do not separately pay for such services.

[10]    The economic terms of Caliber Midstream Agreements are substantially above market given prevailing commodity prices. A principal objective of the Debtors' restructuring is to realign the Debtors' gathering, transportation, and processing expenses with market realities.

variety of E&P companies—substantially all of their sales of crude oil and natural gas in fiscal

years 2014, 2015, and 2016 was sold through arrangements made by the wells' operators and at

sales points at or close to the producing wells.

24.    The TUSA Debtors' average daily production increased from 11,441 boep/d in

fiscal year 2015 to 13,416 boep/d in fiscal year 2016.[11] Approximately 85% of the production in

fiscal year 2016 was attributable to wells operated by the TUSA Debtors. The TUSA Debtors

realized approximately $181 million in revenue from oil and gas sales in fiscal year 2016,

compared to approximately $284 million for fiscal year 2015.

### (v)    Hedging Arrangements

25.    To reduce exposure to adverse fluctuations in crude oil prices and achieve more

predictable cash flow, the TUSA Debtors use commodity derivative instruments for a portion of

their crude oil production. During fiscal years 2015 and 2016, the TUSA Debtors recognized

gains of $64.1 million and $38.5 million, respectively, on their commodity derivative positions

due to continued decreases in underlying crude oil prices. The TUSA Debtors recorded realized

commodity derivative gains of $11.4 million in fiscal year 2015 and $71.9 million in fiscal year

2016. The last of the TUSA Debtors' commodity derivative contracts entered into before the

dramatic decline in oil prices beginning in the second half of fiscal year 2015, established as

costless dollars, expired by December 31, 2015.

26.    The TUSA Debtors are currently party to one derivative contract, which is with a

bank within the syndicate of lenders for TUSA's senior secured reserve-based credit facility.

TUSA's commodity derivative swap contract is for approximately 1,000 Bbl/d with a weighted

---

[11]    This increase in production was offset by a 46% decrease in weighted average realized prices from $68.13 per
boe for fiscal year 2015 to $37.01 per boe for fiscal year 2016.

average price of $60.03 for fiscal year 2016 (price reflects NYMEX West Texas Intermediate contracts). This swap contract was entered into during a depressed commodity pricing environment and covers only a small portion of the TUSA Debtors' anticipated production during those future periods.

### D.    Ranger's Fabrication Business

27.    The remaining Debtors in these cases—Ranger Fabrication, LLC and its two Debtor subsidiaries—operated a fabrication business that specialized in the manufacture and sale of specialized equipment used in the E&P and midstream industries. Ranger's customers included TUSA, Caliber, and others. Ranger ceased operations in early 2016, and its remaining assets were liquidated at auction on March 17, 2016, generating net proceeds of approximately $375,000. At the time, Ranger had secured indebtedness of approximately $1 million, all of which was held by its parent, TPC.[12] Because the auction proceeds were insufficient to satisfy Ranger's secured debt in full, its unsecured creditors were left unpaid. As discussed in greater detail below, the Debtors' plan support agreement with certain holders of the TUSA Notes (as defined below) will facilitate a cash distribution to Ranger's unsecured creditors.

### E.    The Debtors' Corporate and Capital Structures

#### (i)    Corporate Structure

28.    A corporate organization chart depicting the ownership structure of the Debtors and their Non-Debtor Affiliates is attached hereto as **Exhibit A**.

29.    Non-Debtor TPC is the direct or indirect parent company of each of the Debtors and Non-Debtor Affiliates. TPC, a Delaware corporation, is publicly traded on the NYSE MKT (TPLM). TPC is the direct parent of Debtor TUSA. TUSA, a Colorado corporation, is, in turn,

---

[12]    The majority of the TPC-held Ranger debt was purchased by TPC from Wells Fargo Equipment Finance, Inc.

the direct parent of Debtors Foxtrot Resources LLC ("**Foxtrot**") and Leaf Minerals, LLC ("**Leaf Minerals**"), each of which is a Colorado limited liability company. TPC is also the direct parent of Debtor Ranger Fabrication, LLC, a Delaware limited liability company. Ranger Fabrication, LLC is, in turn, the direct parent of Debtors Ranger Fabrication Management Holdings, LLC and Ranger Fabrication Management, LLC, each of which is also a Delaware limited liability company.

30.    TPC houses certain of the Company's shared services and corporate functions. TUSA and its subsidiaries comprise the Company's E&P business. TUSA conducts most of the Debtors' E&P operations. Foxtrot holds oil and gas leases in Montana, and Leaf Minerals owns certain non-operating mineral interests. Ranger, previously an oilfield services fabrication business that primarily supplied to Caliber and TUSA, ceased operations in early 2016.

> ### (ii)    *Capital Structure*

31.    As of the Petition Date, TUSA and its subsidiaries owe or guarantee approximately $689 million in long-term debt, as detailed below:

(a)    $308 million of outstanding principal and letter of credit exposure under TUSA's senior secured reserve-based revolving credit facility (inclusive of letter of credit exposure); and

(b)    $381 million of TUSA 6.75% senior unsecured notes due 2022.

TPC and RockPile also have outstanding long-term debt. Triangle's indebtedness, however, is heavily "siloed." TPC does not guarantee any substantial indebtedness of its subsidiaries, and Triangle's three principal operating segments do not guarantee each other's debt facilities, nor do such facilities "cross-default" to the debt issued by other operating segments.[13]

---

[13]    Accordingly, the following discussion is limited to the funded indebtedness of the TUSA Debtors. Further information on Triangle's other funded indebtedness is set forth in TPC's Form 10-K for fiscal year 2016, filed on April 14, 2016.

32.    *The RBL Credit Facility*. TUSA is party to a senior secured reserve-based credit facility (the "**RBL Credit Facility**") under that certain Second Amended and Restated Credit Agreement (the "**RBL Credit Agreement**"), with Wells Fargo Bank, National Association, as administrative agent and issuing lender (in such capacity, the "**RBL Agent**"), and the lenders named therein (the "**RBL Lenders**"). TUSA's obligations under the RBL Credit Facility are guaranteed by Foxtrot and Leaf Minerals and secured by (a) liens on and security interests in substantially all of TUSA's proved hydrocarbon reserves, (b) liens and security interests in substantially all of the non-oil and gas assets, including cash, of TUSA, Foxtrot, and Leaf Minerals, other than certain excluded collateral, and (c) pledges in TUSA's membership interests in Foxtrot and Leaf Minerals, certificates representing such membership interests, if any, and any of TUSA's rights to money or property in respect of the membership interests. The RBL Credit Facility matures on October 16, 2018.

33.    The RBL Credit Facility has a nominal commitment amount of $1 billion, but the maximum credit exposure at any given time is limited by the borrowing base then in effect. The borrowing base under the RBL Credit Agreement is redetermined by the RBL Agent and RBL Lenders semi-annually, on or about May 1 and November 1. The borrowing base is also subject to up to four interim, unscheduled redeterminations each calendar year—two at the election of TUSA and two at the election of the Required Lenders (as defined in the RBL Credit Agreement).

34.    On April 28, 2016, the RBL Agent redetermined the borrowing base from $350 million to $225 million. The amount then outstanding on the RBL Credit Facility— approximately $350 million—exceeded the new borrowing base by approximately $125 million, resulting in a borrowing base deficiency. Pursuant to the RBL Credit Agreement, TUSA elected

to pay the deficiency in three equal monthly installments of approximately $42 million, the first

of which was paid on May 31, 2016. As of the Petition Date, approximately $308 million is

outstanding under the RBL Credit Agreement, including outstanding letters of credit and other

ancillary obligations.

35.     *The TUSA Notes*. TUSA also has substantial funded indebtedness under its senior

unsecured notes. Pursuant to that certain Indenture dated as of July 18, 2014, by and among

Wilmington Trust, National Association, as Trustee, TUSA, and the subsidiary guarantors listed

thereto, TUSA issued $450 million aggregate principal amount of 6.75% senior notes with a

maturity date of July 15, 2022 (the "**TUSA Notes**"). The obligations under the TUSA Notes are

guaranteed on an unsecured basis by Foxtrot and Leaf Minerals. As of the Petition Date, the

TUSA Notes had an outstanding principal balance of approximately $381 million.

36.     *The Ranger Indebtedness*. As of March 2016, when Ranger's remaining assets

were sold at auction, the Ranger Debtors had secured debt obligations of approximately $1.55

million consisting of:

(a)     Approximately $250,000 in aggregate principal pursuant to (a) that certain
        Combination Loan and Security Agreement dated as of November 18, 2014
        between Wells Fargo Equipment Finance, Inc. ("**WFEFI**") and Ranger
        Fabrication, LLC, (b) that certain Security Agreement dated as of May 4, 2015
        between WFEFI and Ranger Fabrication, LLC, and (c) that certain Promissory
        Note dated as of April 24, 2015 between WFEFI and Ranger Fabrication, LLC
        (collectively, the "**Wells Equipment Financing**"); and

(b)     Approximately $50,000 in aggregate principal pursuant to that certain Secured
        Credit Agreement dated as of February 16, 2016 by and between Ranger
        Fabrication, LLC and TPC.

The Wells Equipment Financing was assigned to TPC in December 2014, making TPC the

Ranger Debtors' sole secured creditor. As noted above, Ranger's remaining assets were

liquidated at auction in March 2016, resulting in net proceeds insufficient to satisfy Ranger's

secured indebtedness in full. In addition to their funded debt, the Ranger Debtors have approximately $1.25 million in unsecured trade claims.

## III.    Events Precipitating the Chapter 11 Cases

### A.    Challenging Macroeconomic Conditions

37.    The Debtors commenced these Chapter 11 Cases in the midst of a historically severe downturn in the commodity markets, with the objective of realigning their capital structure with new market realities. The Debtors intend to use the chapter 11 process to implement a balance-sheet restructuring—including the elimination of over $380 million in funded indebtedness under the TUSA Notes—and emerge from chapter 11 well positioned to weather a potentially prolonged market downturn and capture growth opportunities as conditions improve.

38.    Since fall 2014, commodity prices have fallen dramatically, with crude oil and natural gas spot prices reaching lows of approximately $26/Bbl and $1.50/MMBtu, respectively, in early 2016. Numerous factors have contributed to the market downturn. Increased domestic production attributable to more efficient exploitation of unconventional plays, coupled with unconstrained production among OPEC countries, has led to a global supply glut. At the same time, aggregate demand for oil and gas has softened as economic growth in developing nations eases.

39.    The commodity price downturn has had predictable consequences on the Debtors' financial results. Excluding the effects of hedges and derivative activities, the Debtors' weighted average sale price per barrel of oil equivalent fell from $68 in fiscal year 2015 to $37 in fiscal year 2016. As a result, the Debtors' revenue declined over $100 million from fiscal year 2015 to fiscal year 2016, despite a 17% year-over-year increase in average daily production volumes. The same trends are evident in the Debtors' proved reserve values, which fell from nearly $1

billion to approximately $330 million between fiscal years 2015 and 2016.[14] Further, while the

Debtors have implemented numerous initiatives to control costs and manage liquidity during the

market downturn, many aspects of their cost structure—including their cost of midstream

services—are relatively inelastic.

40.     Future commodity prices are impossible to forecast with certainty. Unpredictable

factors such as geopolitical instability, war, weather, and others significantly influence the

direction of the oil and gas markets. However, as forward price curves indicate, the market does

not anticipate a sharp, near-term rebound in prices. Accordingly, the Debtors' principal strategic

objective is to manage a prolonged period of depressed prices, while also positioning themselves

to capture upside opportunities as market conditions improve.

### B.     Cost and Liquidity Management

#### (i)     Operational Initiatives

41.     The Debtors responded to the fall in commodity prices with numerous efforts to

proactively manage liquidity and preserve value for stakeholders, including reductions in capital

expenditures, targeted sales of non-core assets, and reductions in G&A spending.

42.     To more closely align capital expenditures with cash flows, the Debtors released

their four active drilling rigs in fiscal year 2016, resulting in aggregate capital expenditure

reductions of 74%. During fiscal year 2016, the Debtors delivered 18 gross drilled but

uncompleted wells for completion as commodity prices warranted. The Debtors realized a 73%

year-over-year reduction in drilling and completion costs in fiscal year 2016 and have achieved

---

[14]     These amounts represent the PV-10 value of the Debtors' proved reserve as reported in TPC's Form 10-K for
fiscal year 2016 and are based on pricing assumptions dictated by SEC regulations. While the Debtors believe
that the SEC's pricing assumptions are conservative—and thus that the actual economic value of their proved
reserves may be significantly higher—the year-over-year change in the referenced values is nonetheless
illustrative of the substantial decline in reserve values the Debtors have experienced.

drilling and completing cost reductions of $1.6 to $1.9 million since March 2015, indicating that, to the extent the Debtors have continued to drill and complete new wells, they have done so more efficiently, and for less cost, than in the past. The Debtors' fiscal year 2017 capital expenditure program continues to emphasize disciplined cost control and is tailored to projected cash flow, with flexibility to opportunistically expand capital expenditures as commodity prices warrant.

43.    The Debtors also explored opportunities to enhance liquidity by monetizing non-core oil and gas properties and other assets as market conditions warranted. Owing to generally depressed asset sale values and other factors, the Debtors ultimately did not identify many favorable sale opportunities. Nonetheless, in February 2016, the Company sold approximately 550 acres of non-operating oil and gas leases to a counterparty for approximately $410,000.

44.    Finally, the Debtors achieved significant G&A cost reductions by, among other things, implementing targeted workforce reductions in January 2016, resulting in projected annual cost savings of approximately 40%.

### (ii)    *Financing Activities*

45.    In addition, the Debtors have judiciously managed their access to liquidity under the RBL Credit Facility. In April 2015, the RBL Credit Facility was amended to replace the existing total funded debt leverage ratio with a senior secured leverage ratio covenant; add an interest coverage ratio; and add an equity cure right for non-compliance with the financial covenants, giving TUSA additional "headroom" on its financial covenants. In early 2016, TUSA made two draws under the RBL Credit Facility: (a) a borrowing of approximately $30 million in January 2016 and (b) a subsequent borrowing of approximately $105 million in late March 2016, the latter representing substantially all remaining availability under the RBL Credit Facility, relative to the then-existing borrowing base.

46.     As discussed above, on April 28, 2016, the RBL Agent redetermined the borrowing base under the RBL Credit Facility from $350 million to $225 million. Because the RBL Credit Facility was substantially fully drawn as of the redetermination date, the redetermination resulted in a borrowing base deficiency of approximately $125 million. Pursuant to the RBL Credit Agreement, TUSA elected to pay the deficiency in three equal monthly installments of approximately $41.7 million, the first of which was paid on May 31, 2016.

47.     In connection with its first installment payment, TUSA requested that the RBL Agent and RBL Lenders waive certain potential financial covenant violations for the fiscal quarter ended April 30, 2016, or forbear from exercising remedies in connection with such potential defaults. On May 27, 2016, TUSA and the RBL Lenders agreed to a forbearance until July 8, 2016, subject to various terms and conditions.

**C.     Restructuring Negotiations**

48.     Despite Triangle's myriad of efforts to control costs and manage liquidity, Triangle recognized that a prolonged downturn in commodity prices could necessitate a more comprehensive deleveraging transaction. Accordingly, in March 2016, Triangle announced its retention of legal and financial advisors to assist in evaluating strategic alternatives. In collaboration with its restructuring advisors, Triangle carefully evaluated a range of strategic options, including selling material assets or business segments; seeking additional financing; or refinancing, recapitalizing, or restructuring all or a portion of the Company's existing debt. Triangle carefully considered various means of effectuating one or more strategic transactions, including both in-court and out-of-court alternatives.

49.     Beginning in March 2016 and continuing through the Petition Date, Triangle has engaged in intensive negotiations with its principal stakeholders, including holders of a

substantial majority by value of the TUSA Notes; Caliber and First Reserve; NGP Triangle

Holdings ("**NGP**");[15] and the RBL Agent and RBL Lenders.

### (i)       Triangle's Consolidated Restructuring Efforts

50.       In March 2016, Triangle and one of the largest holders of the TUSA Notes

entered into a non-disclosure agreement and commenced discussions regarding a consensual

restructuring or recapitalization of Triangle. These discussions focused initially on a consolidated

restructuring involving TPC, TUSA, and Caliber. In broad terms, the parties discussed a

reconstitution of Triangle's E&P and midstream business lines through the allocation of

reorganized TPC equity among the principal stakeholders of TPC, TUSA, and Caliber. In

particular, the parties discussed a potential exchange of the TUSA Notes, the TPC Convertible

Note, and First Reserve's equity interests in Caliber into equity interests of reorganized TPC, in

allocations to be negotiated.

51.       The Company subsequently entered into non-disclosure agreements and began

discussions with First Reserve and NGP regarding a consolidated restructuring. For various

reasons, however, neither party was amenable to a transaction of that nature. NGP indicated that

it preferred to receive a cash recovery. Caliber likewise indicated that it would seek to enforce its

existing contracts with TUSA rather than participate in a global restructuring.[16]

### (ii)       The Debtors' "Standalone" Restructuring Efforts and Plan Support Agreement

---

[15]    NGP holds TPC's 5% convertible note with an initial principal amount of $120 million (the "**TPC Convertible Note**").

[16]    To that end, on May 27, 2016, Caliber's subsidiary, Caliber North Dakota, LLC, filed a complaint against TUSA in North Dakota state court for a declaratory judgment that certain "dedications" of oil and gas properties set forth in the Primary MSAs are valid and enforceable real covenants that "run with the land" under North Dakota law. The Debtors dispute the allegations in the declaratory judgment complaint.

52.     Given the lack of sufficient stakeholder support from NGP and First Reserve for a consolidated restructuring, the Debtors refocused their efforts on a "standalone" restructuring of TUSA. In late May and early June 2016, noteholders collectively holding over 80% in aggregate principal amount of the TUSA Notes (the "**Participating Noteholders**") engaged legal and financial advisors and organized an ad hoc group (the "**Ad Hoc Noteholder Group**") to negotiate a standalone TUSA restructuring.

53.     On June 29, 2016, the Debtors and Participating Noteholders holding approximately 73% by amount of the TUSA Notes entered into the Plan Support Agreement (the "**PSA**"). The PSA outlines the terms of a consensual, prearranged chapter 11 plan that Participating Noteholders have agreed to support. Under the contemplated plan, the Debtors will pay the existing RBL Credit Facility in full in cash on the effective date and exchange the TUSA Notes for 100% of the new common stock of reorganized TUSA, subject to dilution from, among other things, other general unsecured claims and a management incentive plan.

54.     The PSA further contemplates a new money rights offering (as defined in the PSA, the "**New Money Rights Offering**") offered ratably to the holders of the TUSA Notes and backstopped by certain Participating Noteholders. Because reorganized TUSA's liquidity needs will depend on various factors that cannot be forecasted at present, the amount of the New Money Rights Offering will be determined later; however, the Debtors and the Participating Noteholders preliminarily contemplate a rights offering of approximately $100 million. The other terms of the New Money Rights Offering will likewise be negotiated among the Debtors and the Participating Noteholders. Proceeds of the New Money Rights Offering will be used to repay the RBL Credit Facility and for general corporate purposes.

55.     Finally, the PSA envisions a new first-priority RBL credit facility (the "**New Revolving Credit Facility**"), in an amount and on terms to be determined by the Debtors and the Participating Noteholders. The Debtors anticipate that the New Revolving Credit Facility will be secured by substantially all of the assets securing the RBL Credit Facility, and the proceeds thereof used to repay the RBL Credit Facility and for general corporate purposes.

56.     The PSA contains numerous other customary terms and conditions, including standard representations and warranties, covenants, case "milestones," and provisions for the payment of the reasonable and documented fees and expenses of the Ad Hoc Noteholder Group's professionals. The PSA also contains a "fiduciary out" that allows the Debtors to evaluate and, if appropriate, enter into a superior alternative transaction without liability to the Participating Noteholders, if their fiduciary duties so require.

### D.     Orderly Wind Down of the Ranger Debtors

57.     Pursuant to the PSA, the Participating Noteholders contemplate a cash distribution to general unsecured creditors of the Ranger Debtors under a chapter 11 plan. As noted above, Ranger ceased operations and liquidated its remaining assets earlier this year. The Ranger auction generated insufficient cash proceeds to fully repay Ranger's secured debt and, as a result, no proceeds were available for distribution to Ranger's unsecured creditors. While the Debtors believe that Ranger's general unsecured creditors have received all to which they are legally entitled, given Ranger's unsatisfied secured debt, certain Ranger creditors have nonetheless commenced lawsuits or issued demands against Ranger on account of their unpaid claims. To avoid the distraction of responding to such proceedings and demands in ad hoc fashion, the Debtors, with the support of the Ad Hoc Noteholder Group, believe that a chapter 11 plan of liquidation represents the fairest and most efficient way to complete Ranger's wind down. The Debtors anticipate that a proposed cash distribution to Ranger's unsecured creditors

under such plan will result in better recoveries for such creditors than would otherwise be possible.

58.     In order to implement the restructuring contemplated by the PSA, on June 29, 2016, the Debtors commenced these Chapter 11 Cases.

## PART II

## FIRST DAY PAPERS

59.     To facilitate their restructuring efforts, the Debtors have filed the First Day Papers, each as listed on the attached **Exhibit B**, concurrently with this Declaration and respectfully request that this Court center the proposed orders granting such First Day Papers. I have reviewed each of the First Day Papers and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. I believe that the relief sought in each First Day Papers (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in maximizing value during these Chapter 11 Cases.

## I.     Administrative Pleadings (Items 1 through 3)

60.     The Debtors have filed three "administrative" pleadings that seek to (a) jointly administer the Chapter 11 Cases for procedural purposes only, (b) authorize the Debtors to file a consolidated list of creditors, and (c) authorize the Debtors to retain Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent. I am familiar with customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these papers.

### A.     Joint Administration (Item 1)

61.     The Debtors are requesting that the Chapter 11 Cases be jointly administered for procedural purposes only. As set forth above, each of the Debtors is affiliated with the others.

Joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other papers and related notices that otherwise would need to be filed in all of the cases absent joint administration. Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files and will ease the burden on the U.S. Trustee in supervising these cases. Accordingly, joint administration will save considerable time and expense for all parties in interest and this Court.

### B.    Motion to File Consolidated List of Creditors (Item 2)

62.    The Debtors seek entry of any order (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (b) authorizing the Debtors to redact certain personal identification information for individual creditors, and (c) granting related relief.

63.    I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be unnecessarily burdensome and result in duplicate mailings. Moreover, I believe that cause exists to authorize them to redact address information of individual creditors because such information could be used to perpetrate identity theft.

### C.    Application to Retain Prime Clerk as Claims and Noticing Agent (Item 3)

64.    The Debtors seek authority to retain Prime Clerk as claim and noticing agent in the Chapter 11 Cases. I understand that requesting such appointment is required by the rules of this Court given that the Debtors have more than 200 creditors and/or parties in interest listed on their creditor matrix. I believe that Prime Clerk's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases. In addition, Prime Clerk will transmit, receive,

24

docket, and maintain proofs of claim filed in connection with the Chapter 11 Cases. Accordingly, I believe that retention of Prime Clerk, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of the Debtors and their estates and their creditors.[17]

## II.    Operational Pleadings (Items 4 through 9)

### A.    Motion to Continue Cash Management System (Item 4)

65.    *Cash Management System*. The Debtors have filed a motion to continue their ordinary course banking practices. I understand that the Debtors maintain a cash management system (the "**Cash Management System**") to facilitate the efficient flow and management of funds involved in the Debtors' operations. The Cash Management System comprises five cash accounts maintained at financially stable, FDIC-insured banks out of which the Debtors manage cash receipts and disbursements (the "**Bank Accounts**"). All of the Bank Accounts of the TUSA Debtors are maintained at Wells Fargo Bank, N.A. The Ranger Debtors have one cash account, which is maintained at FirstBank of Colorado, N.A.

66.    I believe that the Cash Management System is essential to enable the Debtors to control and monitor funds, ensure cash availability and liquidity, comply with the requirements of their financing arrangements, and reduce administrative expenses by facilitating the movement of funds and enhancing the development of accurate account balance information.

67.    *Business Forms*. In the ordinary course of business, the Debtors use checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "**Business Forms**"). Because the Business

---

[17]    The Debtors intend to file a subsequent application to retain Prime Clerk to perform certain administrative services under Bankruptcy Code section 327.

Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Requiring the Debtors to modify the Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

68.     *Relief From The Requirements of Section 345*. To the extent the Debtors' existing cash management system does not strictly comply with Bankruptcy Code section 345, the Debtors request a limited waiver of its requirements or, at minimum, a 45-day extension of time to comply with certain requirements. With respect to its Bank Accounts at Wells Fargo, the Debtors respectfully request a waiver of the requirements of Bankruptcy Code section 345(b), or in the alternative, a 45-day extension of the time in which to comply with the requirements of section 345(b) (during which time the Debtors would engage in discussions with the U.S. Trustee or make other arrangements, subject to the Court's approval). With respect to its Bank Account at FirstBank, the Debtors respectfully request a 45-day extension of time within which to cause FirstBank to execute a Uniform Depository Agreement.

69.     I believe that the funds held in the Bank Accounts with Wells Fargo are secure and that obtaining bonds to secure those funds, as required by section 345(b), is unnecessary in these cases. Wells Fargo is a large, financially stable banking institution with FDIC insurance up to the applicable limit per account. To the extent the funds in the Bank Accounts at Wells Fargo exceed FDIC insured limit, I believe that the risk associated with the uninsured amounts is *de minimis* considering Wells Fargo's overall strength and stability. Wells Fargo is a highly rated, federally chartered bank subject to supervision by federal banking regulators.

70.     On the other hand, the costs associated with strict compliance with section 345(b) are substantial. Absent the requested waiver, Wells Fargo would comply with section 345(b)(2) by purchasing and depositing Ginnie Mae securities in an amount sufficient to collateralize the

amount on deposit in the Wells Fargo Bank Account. Wells Fargo has informed the Debtors that

the cost of purchasing such securities—which Wells Fargo would pass on to the Debtors—would

be approximately 25 basis points and would be over $1 million through March 2017. I believe

that the actual and immediate cost of procuring such securities significantly outweighs the nearly

imperceptible risk that Wells Fargo would suffer a catastrophic failure and lose the funds on

deposit.

71.     The Bank Account at FirstBank currently holds less than $100,000 in cash, well

under the FDIC limit. The Debtors do not anticipate that the account will exceed such threshold

during the Chapter 11 Cases, as Ranger and its subsidiaries are no longer operating and are

unlikely to have any significant cash receipts. Accordingly, all amounts on deposit with

FirstBank are "insured or guaranteed by the United States." The Debtors will use good faith

efforts to cause FirstBank to execute a Uniform Depository Agreement in a form prescribed by

the U.S. Trustee within 45 days of the entry of an order granting the cash management motion.

72.     Accordingly, I believe that the Debtors' request to waive or extend the time to

comply with section 345 is warranted.

73.     *Intercompany Transactions*. In the ordinary course of business, the Debtors

engage in various transactions relating to (a) the business relationship between and among

themselves and (b) the certain shared management, general, administrative, and/or other similar

shared services between themselves and their Non-Debtor Affiliates (the "**Intercompany**

**Transactions**").

74.     I understand that the Intercompany Transactions generally are intended to reduce

administrative costs and ensure the orderly and efficient operation of the Debtors' business.

Accordingly, I strongly believe that the failure to continue the Intercompany Transactions in the

ordinary course of business would unnecessarily and severely hinder the Debtors' operations. For instance, pursuant to the TUSA Services Agreement, TPC provides management, operating, and general and administrative services to TUSA that TUSA requires to maintain ordinary course operations. Continuing the Intercompany Transactions is therefore in the best interests of the estates.

75.     Accordingly, the Debtors are requesting authorization to continue to maintain existing bank accounts and the existing Cash Management System and to pay related prepetition obligations. The Debtors further seek authorization to continue using existing Business Forms. In addition, the Debtors seek authorization for the continuation of Intercompany Transactions and granting of administrative expense priority status to postpetition Intercompany Claims. I believe such relief is necessary to the successful operations and, thus, restructuring efforts, of the Debtors postpetition.

### B.     Payment of Employee and Payroll Obligations (Item 5)

76.     To minimize the personal hardship that the Debtors' employees will suffer if prepetition obligations are not honored, as well as the harm which would result to the Debtors if employee morale is not maintained, it is critically important that the Debtors pay prepetition wages, compensation, and amounts associated with employee benefit programs and continue such programs in the ordinary course.

77.     The Debtors have 59 employees (the "**Employees**") in their corporate offices in Colorado and at field locations in North Dakota. Of these 59 Employees, approximately 46 are salaried and 13 are hourly. All 59 of the Employees are employed by TUSA. In addition, the Debtors utilize approximately 18 temporary labor and independent contracting agencies, both at their Denver offices and in the field, who are engaged through contractor agreements, temporary staffing agencies, other outside firms, or other arrangements.

78.      I believe that only two of the Debtors' Employees are owed prepetition amounts in excess of the priority cap established under the Bankruptcy Code, and I understand, may therefore have claims with respect to their accrued but unpaid prepetition wages or salaries that I am told are granted priority over certain other claims under the Bankruptcy Code. The Debtors seek authority pursuant to the interim order to pay the Prepetition Employee Obligations up to the priority cap, and pursuant to the final order, authority to pay amounts that exceed the priority cap.

79.      *Wages and Salaries*. The Debtors estimate that, as of the Petition Date, approximately $140,000 in wages, salaries, and related payroll taxes are accrued and unpaid.

80.      *Other Compensation: Vacation, Holiday, and Sick Time, and Business Expenses*. The Debtors also offer their Employees other forms of compensation, including vacation time ("**Vacation Time**"), paid holidays, sick time, and reimbursement of certain business expenses. The Debtors anticipate that their Employees will use any accrued Vacation Time, holiday time, or sick time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations. The Debtors estimate that, as of the Petition Date, the Employees had accrued approximately $295,000 of unused Vacation Time.

81.      In addition, the Debtors routinely reimburse the Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, supplies, and other business expenses (collectively, the "**Reimbursable Expenses**"). The Debtors also have a corporate credit card for purposes of certain expenses. The Employees who do not have corporate credit cards and incur out-of-pocket costs are reimbursed for these expenses. As of the Petition Date, the Debtors estimate that their accrued and unpaid

obligations for the Reimbursable Expenses, including amounts outstanding on the corporate credit cards, are approximately $30,000.

82.     These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees during the reorganization process.

83.     *Employee Benefit Plans*. The Debtors provide benefit packages to Employees, including medical plans, dental plans, vision plans, and life insurance plans. The Debtors fund the medical and insurance benefits through Company and Employee contributions. The Employee Benefits represent an important component of an Employee's compensation.

84.     The Debtors offer the Employees a medical insurance plan (the "**Medical Plan**") through Aetna. In particular, the Debtors provide two standard Medical Plans: an open choice, low-deductible PPO and a high-deductible plan. The Debtors offer their Employees who elect the high-deductible plans the use of health savings accounts for various medical claims not otherwise covered or payable by the Medical Plans. The Debtors also offer Employees the use of flexible spending accounts. Employees who do not participate in health savings accounts may use the flexible spending accounts for dependent care and various medical, dental, and vision claims not otherwise covered or payable by the Medical Plans.

85.     The Medical Plans are funded through Employee contributions by participating Employees and by the Debtors. Approximately 80% of the cost of the Medical Plans is borne by the Debtors, and Employees contribute to the Medical Plans through payroll deductions to pay for the balance. As of the Petition Date, the Debtors estimate that no amounts or true up payments are currently owed under the Medical Plans, but estimate the total amounts held by the Debtors under the health savings and flexible spending plans are approximately $1,000.

86.     The Debtors also offer the Employees dental benefits (the "**Dental Plan**") through MetLife. The Dental Plan is funded through contributions by participating Employees and by the Debtors. To the Debtors' knowledge, no unpaid amounts are owed under the Dental Plan as of the Petition Date.

87.     The Debtors also offer the Employees vision benefits (the "**Vision Plan**") through Aetna. The Vision Plan is funded through contributions by participating Employees and by the Debtors. As of the Petition Date, the Debtors estimate that no amounts are owed under the Vision Plan.

88.     The Debtors provide Employees with, or, in some cases, give Employees the option of purchasing, certain types of life and disability insurance, including basic life, accidental death and dismemberment, short-term disability insurance, long-term disability insurance, supplemental life, and related programs (collectively, the "**Life Insurance Plans**") pursuant to policies issued by Lincoln Financial and MetLife. The Debtors pay for certain of these plans, while others are optional plans purchased by eligible Employees at their own expense. As of the Petition Date, the Debtors estimate that there are no obligations outstanding under the Life Insurance Plans, inclusive of amounts withheld from Employees. Out of an abundance of caution, however, the Debtors seek authority to pay any prepetition amounts due on account of the Life Insurance Plans in the ordinary course.

89.     The Debtors also provide Employees with the Health Advocate service (the "**Health Advocate Service**") through HUB International. The Health Advocate Service offers Employees a personal health advocate, a trained professional who aids Employees with issues related to the healthcare system, including assistance in resolving claims, negotiation of fees with healthcare providers, assistance on prescription drug issues, access to experts for consultations

and second opinions in the event of a serious illness, and assistance in dispute resolution. HUB International provides the Health Advocate Service for no extra charge, so neither the Debtors nor the Employees pay any additional monthly charge on account of this program.

90.     *Savings and Retirement*. The Debtors offer Employees a savings and retirement plan (the "**401(k) Plan**") through TransAmerica. The 401(k) plan is funded solely through Employee Contributions. As of the Petition Date, approximately $6,000 withheld and outstanding amounts exist under the 401(k) Plan.

91.     *Workers Compensation*. The Debtors provide workers' compensation benefits to all Employees, as required by state law. Workers' compensation benefits for the Debtors' North Dakota Employees are provided through North Dakota's state-run workers' compensation fund (the "**North Dakota Workers' Compensation Insurance**"), for which the Debtors pay Workforce Safety and Insurance ("**WSI**"), the sole provider and administrator of the workers' compensation system in North Dakota, an annual premium. The most recent premium—covering the period August 1, 2015 to July 31, 2016—was paid in January 2016, in the approximate amount of $63,580. There is no deductible under the workers' compensation policy with WSI.

92.     Workers' compensation benefits for the Debtors' Colorado-based Employees are covered primarily under the Debtors' workers' compensation insurance program (the "**Colorado Workers' Compensation Insurance**," and together with the North Dakota Workers' Compensation Insurance, the "**Workers' Compensation Programs**") administered by the Debtors' insurance carrier, Charter Oak Fire Insurance Company/The Travelers Company ("**Travelers**"). The Debtors paid a premium of approximately $23,518 for the Colorado Workers' Compensation Insurance for the policy period January 31, 2016 to January 31, 2017. There is no deductible under the workers' compensation policy with Travelers.

93.     No prepetition amounts are presently outstanding under the Workers'
Compensation Programs. The Debtors are aware of no pending or asserted workers'
compensation claims, have posted no collateral in favor of Federal Insurance, have made no
reserves for potential liability, and are otherwise unaware of any outstanding prepetition
workers' compensation obligations. Nonetheless, there may be unasserted workers'
compensation claims against the Debtors or other workers' compensation obligations relating to
the prepetition period.

94.     *Employee Withholdings*. Finally, the Debtors routinely withhold from Employee
paychecks amounts that the Debtors are required to transmit to third parties. Examples of such
withholding include Social Security, FICA, federal and state income taxes, garnishments,
charitable donations, health care payments, other insurance payments, 401(k) contributions, and
certain other voluntary payroll deductions. The Debtors request authority to direct such withheld
amounts to the appropriate parties.

95.     *Continuation of Employee Programs*. The Debtors seek to continue their ordinary
course Employee compensation (including, without limitation, wages, salaries, commissions, and
bonuses), paid time off, benefits (including, without limitation, insurance and retirement),
expense reimbursement, corporate credit cards, workers' compensation, and related programs
during the postpetition reorganization process. I believe the continuation of these programs is
essential to the success of the Debtors' reorganization.

96.     I believe that continued payment, when due, of prepetition wages and salaries,
and the continuation, without interruption, of compensation and benefit plans, policies,
programs, and practices described herein is necessary to ensure the ongoing services of the
Debtors' Employees during the Chapter 11 Cases.

###### C.    Insurance Motion (Item 6)

97.     In the ordinary course of their business, the Debtors maintain various insurance policies (the "**Insurance Policies**") providing coverage for, among other things, automobile liability, commercial crime liability, directors and officers liability, employment practices liability, energy liability, excess liability, fiduciary liability, general liability, pollution legal liability, property liability, small computer and electronic data processing liability, and umbrella liability. I believe that no amounts are currently outstanding on the Insurance Policies, but, out of an abundance of caution, the Debtors are requesting authorization, but not direction, to pay any prepetition amounts that are discovered to be owing and to continue to pay the policies as they come due without further court order, subject to an aggregate limit of $500,000.

98.     The Insurance Policies are essential to the preservation of the value of the Debtors' business, property, and assets. Not only are some of the Insurance Policies required by various regulations, laws, and contracts that govern the Debtors' commercial activities, but I am informed by counsel that failure to maintain insurance could result in conversion or dismissal of the Chapter 11 Cases or a failure to comply with applicable U.S. Trustee guidelines.

99.     In light of the importance of maintaining insurance coverage with respect to their business activities, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the Insurance Policies and, as necessary, renew, or enter into new such agreements.

###### D.    Taxes Motion (Item 7)

100.     In the ordinary course of business, the Debtors (a) incur income, sales, property, production, and other taxes; (b) pay or remit such taxes to various taxing, licensing, and other governmental authorities; and (c) pay fees to such authorities for licenses, permits, and regulatory assessments required in the ordinary course of business (the "**Taxes**"), and have

generally paid such tax liabilities as they become due. As of the Petition Date, the Debtors

estimate that approximately $145,000 in Taxes are accrued and unpaid.

101.    Many of the Taxes constitute so-called trust fund obligations that the Debtors are

required to collect from third parties and held in trust for payment to the taxing and regulatory

authorities. I understand that the funds that would be used to pay the trust fund Taxes are not

property of the Debtors' estates.

102.    I have also been advised that the nonpayment of certain of the Taxes that

constitute trust fund obligations and are not property of the Debtors' estates may result in

personal liability for the Debtors' officers and directors. Efforts by Taxing Authorities to collect

such trust fund amounts would unnecessarily divert the Debtors' officers and directors from

tasks relating to the restructuring and ongoing management of the Debtors' business.

103.    Additionally, the Taxing Authorities may cause the Debtors to be audited if the

Taxes are not paid immediately. Such audits will unnecessarily divert the Debtors' attention

away from the reorganization process and may cause expense and distraction in excess of the

relatively minimal amount of the Taxes. In all cases, the Debtors' failure to pay Taxes could

have an adverse impact on their ability to operate in the ordinary course of business.

**E.      Utilities (Item 8)**

104.    In connection with the operation of their business and the management of their

properties, the Debtors obtain electricity, telephone, internet and technology, water, and similar

utility products and services (collectively, the "**Utility Services**") from various utility companies

(the "**Utility Companies**"). The Debtors have filed a motion requesting that this Court approve

the Debtors' proposed form of adequate assurance of postpetition payment (the "**Proposed**

**Adequate Assurance**") to the Utility Companies, as that term is used in Bankruptcy Code

section 366, approving procedures for resolving any objections by the Utility Companies relating

to the Proposed Adequate Assurance, and prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors.

105.    In particular, the Debtors have proposed for the Utility Companies the establishment of a newly created, interest-bearing segregated account in which the Debtors will place a deposit equal to approximately two weeks of Utility Services (the "**Utility Deposit Account**"). I believe that creation of the Utility Deposit Account and the additional procedures set forth in the motion adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend. The Debtors estimate the aggregate of all the Utility Deposits will be approximately $135,000.

106.    I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. Such a result could potentially jeopardize the Debtors' ability to perform under their customer contracts and impair the Debtors' reorganization efforts and, ultimately, the value of the Debtors' business. In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.

### F.    Oil and Gas Obligations Motion (Item 9)

107.    The Debtors request entry of an order authorizing the Debtors to honor and pay obligations in connection with their oil and gas properties in the ordinary course of business (the "**Oil and Gas Obligations**"). Pending a final hearing on the motion, the Debtors are seeking authority to satisfy up to $12.5 million prepetition Oil and Gas Obligations and, subject to a final hearing, to honor and/or pay, in their sole discretion, Oil and Gas Obligations in the ordinary course of business.

108.    The Debtors own interests in certain Oil and Gas Leases, which obligate the Debtors to remit royalties to the mineral estate owners (a "**Royalty**"). Additionally, the Debtors are obligated to pay other mineral interest obligations, including overriding royalty interests, non-participating royalty interests, net profit interests, and production payments on certain of their Oil and Gas Leases.

109.    North Dakota and Montana impose a tax (a "**Production Tax**") on oil and gas produced in their respective jurisdictions (excepting the portion of production attributable to tax-exempt interest holders). As of the Petition Date, the Debtors had accrued and unpaid Production Taxes totaling approximately $1.75 million, and request the authorization to pay all Production Taxes as they become due in the ordinary course of business, subject to the Interim Cap.

110.    Debtors regularly incur other ancillary obligations under, or in connection with, their Oil and Gas Leases ("**Lease Maintenance Payments**"). Lease Maintenance Payments include:

(a)    *Lease Rental Payments*. Certain of the Debtors' federal, BIA, and state leases require periodic rental payments, which the Debtors estimate at approximately $7,000 for fiscal year 2017;

(b)    *Top and Protection Lease Bonus Payments*. The Debtors occasionally enter into "top" and "protection" leases to protect their Oil and Gas Leases against certain contingencies that might otherwise cause their leasehold interest to terminate. The Debtors make bonus payments in connection with such leases. The Debtors estimate that such bonus payments will total approximately $1,250,000 for fiscal year 2017;

(c)    *Surface Use Charges*. The Debtors owe contractual and statutory obligations to the owners of the surface estates above their Oil and Gas Leases. The Debtors regularly negotiate consensual agreements with surface estate owners concerning the terms on which the Debtors may access the surface estate to conduct exploration and production operations (a "**Surface Use Agreement**"). Surface Use Agreements frequently provide for cash payments, including one-time cash bonuses, periodic rental and use payments, and compensation for damages caused by the Debtors' operations ("**Surface Use Charges**"). The Debtors' estimated

Surface Use Charges for fiscal year 2017 include bonus payments of $650,000 and rental and use payments of $117,500; and

(d)  *Statutory Damages for Surface Use*. Counsel has explained to me that, if the Debtors and a surface owner cannot agree on the terms of a Surface Use Agreement, the Debtors may nonetheless access the surface estate to the extent necessary to exploit the mineral estate pursuant to an implied easement. Before exercising their implied easement, however, the Debtors must provide the surface owner notice of contemplated drilling operations at least 20 days before such operations commence. Counsel has informed me that, in such cases, the Debtors remain liable to the surface estate owner for "damages sustained by the surface owner . . . for lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations." N.D. Cent. Code § 38-11.1-04.

111.   The Debtors estimate that their accrued and unpaid Lease Maintenance Payments total at least $1.95 million as of the Petition Date. Because certain Lease Maintenance Payments are contingent and unliquidated, however, the Debtors' actual prepetition Lease Maintenance Payments may be significantly higher. The Debtors request authorization to pay all Lease Maintenance Payments as they become due in the ordinary course of business, subject to the Interim Cap.

112.   Furthermore, the Debtors are party to joint operating agreements (each, a "**JOA**") under which an operator is entitled to bill each non-operating working interest holder in the unit its pro rata share of the operator's lease operating expenses and capital expenditures ("**JIBs**"). In turn, the operator distributes to each non-operating working interest holder its share of the well's proceeds (the "**Working Interest Disbursements**"). The Debtors estimate that they have approximately $3,000,000 and $12,000,000, in accrued and outstanding Working Interest Disbursements and JIBs, respectively, as of the Petition Date. The Debtors seek authorization, but not direction, to pay all prepetition and position Working Interest Disbursements and JIBs as they become due in the ordinary course of business, subject to the Interim Cap.

113.    The Debtors also pay lease operating expenses ("**LOE**") to numerous vendors, contractors, suppliers, and other third parties (the "**LOE Vendors**") for goods and services necessary to drill, complete, equip, and operate their wells. The Debtors estimate that they have approximately $15 million in accrued and unpaid LOE as of the Petition Date. The Debtors' attorneys have informed me that unpaid LOE Vendors are entitled to attach and perfect liens on the Debtors' oil and gas properties and produced hydrocarbons and likely would argue that they are entitled to perfect such liens after the Petition Date, notwithstanding the automatic stay and the Debtors' avoidance powers. Accordingly, the Debtors seek authority to pay, in the ordinary course of business, the prepetition and postpetition LOE due to LOE Vendors the Debtors have identified, subject to the proposed interim cap.

114.    The Debtors also rely on a variety of gathering, transportation, processing, and similar midstream services (collectively, "**GTP**") to convey produced oil and gas from the wellhead to points of sale or delivery in a marketable state. The Debtors' primary midstream provider is Caliber, whose arrangements with the Debtors are governed by several long-term midstream services agreements, as discussed in more detail above. The Debtors estimate that accrued and unpaid GTP obligations as of the Petition Date total approximately $6.5 million.

115.    To carry on their businesses without undue disruption, and thereby preserve value for stakeholders, the Debtors must have discretion to pay or honor Oil and Gas Obligations in the ordinary course. As an initial matter, I understand that many of the Debtors' Oil and Gas Obligations—including Mineral Interest Payments and Working Interest Disbursements— constitute funds held in trust for others and therefore are not property of the Debtors' estates. These funds are not available for distribution under a chapter 11 plan and thus can be paid in the ordinary course of business without prejudice to creditors.

116.    I further understand that applicable state law and contractual agreements afford unpaid Oil and Gas Counterparties a variety of remedies, including the right to attach and perfect liens on the Debtors' oil and gas properties and produced hydrocarbons. While the Debtors reserve the right to contest any efforts to exercise such remedies during the Chapter 11 Cases, their ability to do so successfully—or, at least, without serious business disruption—is, in my view, doubtful.

117.    Finally, even if the Oil and Gas Payments were property of the estate and not subject to liens, the relief sought pursuant to this motion is critically important to the Debtors' ongoing business. The Debtors' long-term business prospects depend on the willingness of numerous mineral interest holders, Working Interest holders, surface owners, LOE Vendors, and others to continue dealing with the Debtors. A fundamental premise of the E&P business is that hydrocarbon reserves are a constantly diminishing resource. Thus, an E&P operator must explore and develop new reserves just to maintain existing production levels. Accordingly, the Debtors' long-term prospects depend on their ability to acquire and develop new reserves in the future. To do so successfully, the Debtors will require the cooperation of the various counterparties indicated above. These parties may be unwilling to transact new business with the Debtors if they doubt the Debtors' ability to satisfy their Oil and Gas Obligations. Thus, even if the Debtors could avoid payment of certain accrued Oil and Gas Obligations—which itself is doubtful—the collateral consequences on the Debtors' go-forward business would vastly exceed whatever modest short-run cost savings the Debtors might achieve.

### G.    Use of Cash Collateral Motion (Item 10)

118.    In the weeks preceding the Petition Date, the Debtors engaged in intensive negotiations with the RBL Agent and its professional advisors concerning the terms and condition on which the RBL Agent and RBL Lenders would consent to the Debtors' use of cash

collateral. While these negotiations were protracted and challenging, I believe the terms on

which the Debtors and the RBL Lenders ultimately settled, although not ideal, represent the most

favorable terms the Debtors reasonably could have achieved under the circumstances. To

implement this agreement, the Debtors request entry of an order (a) authorizing the Debtors to

use cash collateral, (b) granting adequate protection to the Prepetition Secured Parties (as defined

below), (c) modifying the automatic stay, to the extent set forth herein, and (d) granting certain

related relief.

119.    I believe that the Debtors have an immediate need to use Cash Collateral, without

which the Debtors cannot maintain the value of their estates during the Chapter 11 Cases.

Although the Debtors' capital structure is not sustainable in the long term, the Debtors have

sufficient liquidity to administer a value-maximizing chapter 11 process. However, much of the

Debtors' cash is Cash Collateral of the RBL Agent, the RBL Lenders, and the other "Secured

Parties" under and as defined in the RBL Credit Agreement (collectively, the "**Prepetition**

**Secured Parties**"). Thus, the Debtors require use of their Cash Collateral to operate their

businesses in the ordinary course and to pay the costs associated with these cases. Without access

to Cash Collateral, the Debtors will rapidly exhaust their liquidity and could be forced to

liquidate.

120.    Based on my extensive experience as a restructuring advisor, and in consultation

with the Debtors' attorneys and investment bankers, I believe that the terms and conditions

required by the Prepetition Secured Parties to permit the use of cash collateral on a consensual

basis are acceptable and necessary, given the Debtors' liquidity needs during the Chapter 11

Cases. I have carefully reviewed the proposed Budget and the covenants and other conditions

relating thereto and believe that it provides the Debtors sufficient flexibility to operate their

business in a value-maximizing manner during the Chapter 11 Cases.

Dated:         June 30, 2016

            Denver, Colorado

                                By:    */s/ John R. Castellano*          
                                Name: John R. Castellano
                                Title:   Chief Restructuring Officer

**<u>EXHIBIT A</u>**

**Corporate Organizational Chart**

# Triangle Organizational Structure



Triangle Petroleum Corporation (Delaware)

100% — Triangle Real Estate Properties, LLC (Colorado)
- Triangle Industrial Properties, LLC (Colorado)
- Bakken Real Estate Development, LLC (Delaware)

100% — Ranger Fabrication, LLC (Delaware)
- Ranger Fabrication Management Holdings, LLC (Delaware)
  - 0.01% Ranger Fabrication Management, LLC (Delaware)

100% — Triangle USA Petroleum Corporation (Colorado)
- Foxtrot Resources LLC (Colorado)
- Leaf Minerals, LLC (Colorado)

100% — RockPile Energy Services, LLC (Delaware)
- RockPile Management Holdings, LLC (Delaware)
  - 0.01% RockPile Management, LLC (Delaware)
- RockPile Wireline Services, LLC (Colorado)
- RockPile Pump Rental Services, LLC (Colorado)
- RockPile Logistics Services, LLC (Colorado)
- RockPile Rig Services, LLC (Delaware)
- RockPile Energy Real Estate, LLC (Colorado)
- RockPile Chemical Services, LLC (Colorado)
- Pinnacle Testing Services, LLC (Colorado)

100% — Elmworth Energy Corporation (Alberta, Canada)

100% — Triangle Caliber Holdings, LLC (Delaware)
- 100% Caliber Midstream, LLC (Delaware)
- 50% Caliber Midstream GP LLC (Delaware)
- 28.3% Caliber Midstream Partners, L.P. (Delaware)
  - Caliber Management Holdings, LLC (Delaware)
    - 0.01% Caliber Management, LLC (Delaware)
  - Caliber North Dakota LLC (Delaware)
  - Caliber Measurement Services, LLC (Delaware)
  - Caliber Fresh Water, LLC (Delaware)
    - 51% Caliber Midstream Fresh Water Partners, LLC (Delaware)

100% — Integrated Operating Solutions, LLC (Colorado)

100% — Optic Infrastructure Development, LLC (Colorado)

Legend:
- Ranger Debtor Entity
- TUSA Debtor Entity
- Non-Debtor Entity

## EXHIBIT B

### List of Pleadings Seeking First Day Relief

1.  Motion Of Debtors For Order (I) Directing Joint Administration Of Cases Under Bankruptcy Rule 1015(b) And Local Bankruptcy Rule 1015-1 And (II) Waiving Requirements Of Bankruptcy Code Section 342(c)(1) And Bankruptcy Rules 1005 And 2002(n)

2.  Motion Of Debtors For Order Under Bankruptcy Code Sections 105(a), 107(c), And 521, Bankruptcy Rule 1007, And Local Bankruptcy Rules 1001-1(c), 1007-2, And 2002-1 Authorizing Debtors to (I) File A Consolidated List of Creditors In Lieu Of Submitting A Separate Mailing Matrix For Each Debtor And (II) Redact Certain Personal Identification Information For Individual Creditors

3.  Application Of Debtors For Order Under Section 156(c) Of Title 28 Of The United States Code, Bankruptcy Code Section 105(a), Bankruptcy Rule 2002, And Local Bankruptcy Rule 2002-1(F) Authorizing The Debtors To Employ And Retain Prime Clerk LLC As Claims And Noticing Agent *Nunc Pro Tunc* To The Petition Date

4.  Motion Of Debtors For Interim And Final Orders Under Bankruptcy Code Sections 105(a), 363, 507(a), 541, 1107(a) And 1108 And Bankruptcy Rules 6003 And 6004 Authorizing Debtors To Pay Prepetition Wages, Compensation, And Employee Benefits

5.  Motion Of Debtors For Order Under Bankruptcy Code Sections 105(a), 363, 1107(a), And 1108 And Bankruptcy Rules 6003 And 6004 Authorizing Debtors To (I) Maintain Existing Insurance Policies And Pay All Insurance Obligations Arising Thereunder And (II) Renew, Revise, Extend, Supplement, Change, Or Enter Into New Insurance Policies

6.  Motion Of Debtors For Order Under Bankruptcy Code Sections 105(a), 363(b), 507(a)(8), And 541 And Bankruptcy Rules 6003 And 6004 Authorizing Debtors To Pay Certain Prepetition Taxes And Related Obligations

7.  Motion Of Debtors For Interim And Final Orders Under Bankruptcy Code Sections 105(a) And 366 (I) Approving Debtors' Proposed Form Of Adequate Assurance Of Payment; (II) Establishing Procedures For Resolving Objections By Utility Companies; And (III) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Service

8.  Motion Of Debtors For Entry Of Interim And Final Orders Under Bankruptcy Code Sections 105(a), 363, 541, 1107(a), and 1108 And Bankruptcy Rules 6003 And 6004 Authorizing Debtors To Honor And Pay Oil And Gas Obligations

9.  Motion Of Debtors For Interim and Final Orders Under Bankruptcy Code Sections 105(a), 345(b), 363, And 503(b), Bankruptcy Rules 6003 And 6004, And Local Bankruptcy Rule 2015-2 (I) Authorizing The Continued Maintenance Of Prepetition Bank Accounts And Payment Of Related Prepetition Obligations, (II) Authorizing Continued Use Of Existing Cash Management System, (III) Authorizing Continued Use

Of Existing Business Forms, (IV) Authorizing A Waiver Of, Or Extension Of Time To Comply With, Requirements Of Bankruptcy Code Section 345(b), And (IV) Authorizing The Continuation Of, And Accordance Of Administrative Expense Priority Status To, Intercompany Transactions

10.     Motion of Debtors For Interim And Final Orders Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, And 507, Bankruptcy Rules 2002, 4001, And 9014, And Local Bankruptcy Rule 4001-2 (I) Authorizing Debtors To Use Cash Collateral; (II) Granting Adequate Protection To Prepetition Secured Parties; (III) Modifying Automatic Stay; (IV) Granting Related Relief; And (V) Scheduling a Final Hearing