**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| TRIANGLE USA PETROLEUM CORPORATION, *et al.*, | Case No. 16-11566 (MFW) |
| | |
| | Jointly Administered |
| Debtors.[1] | |
| | **Hr'g Date: TBD[2]** |
| | **Obj. Due: August 4, 2016 at 4:00 p.m. (Eastern)** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION OF DEBTORS FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 365(a) AND BANKRUPTCY RULE 6006 AUTHORIZING DEBTORS TO REJECT CERTAIN EXECUTORY CONTRACTS WITH AFFILIATES OF CALIBER MIDSTREAM PARTNERS, L.P.**

       Triangle USA Petroleum Corporation ("**TUSA**") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**" and, together with Triangle Petroleum Corporation and its non-debtor controlled affiliates and subsidiaries, "**Triangle**"), hereby move (this "**Motion**") this Court for entry of an order under sections 105(a) and 365(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") authorizing, but not directing, the Debtors to reject one or more executory contracts between TUSA and certain affiliates of Caliber Midstream Partners, L.P. (collectively, "**Caliber**") identified on **Exhibit A** attached hereto (the "**Specified Caliber Contracts**"), effective upon ten days' notice

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are: Triangle USA Petroleum Corporation (0717); Foxtrot Resources LLC (6690); Leaf Minerals, LLC (9522); Ranger Fabrication, LLC (6889); Ranger Fabrication Management, LLC (1015); and Ranger Fabrication Management Holdings, LLC (0750). The address of the Debtors' corporate headquarters is 1200 17th Street, Suite 2500, Denver, Colorado 80202.

[2]    Contemporaneously herewith, TUSA has commenced an Adversary Proceeding (as defined below) by which it seeks a declaratory judgment that the Specified Caliber Contracts (as defined below) do not contain covenants or equitable servitudes that run with the land. As discussed below, the Debtors propose that the hearing on this Motion be held simultaneously with the hearing on dispositive motions in the Adversary Proceeding.

to Caliber, as set forth more fully below. In support of this Motion, the Debtors rely upon and

fully incorporate by reference the Declaration of John R. Castellano in support of this Motion

(the "**Castellano Declaration**"), attached as **Exhibit C** hereto. [3] In further support of this

Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.       The legal predicates for the relief requested herein are Bankruptcy Code sections

105(a) and 365(a) and Bankruptcy Rule 6006.

3.       Pursuant to 9013-1(f) of the Local Bankruptcy Rules for the United States

Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**") the Debtors

consent to the entry of a final judgment or order with respect to this Motion if it is determined

that this Court would lack Article III jurisdiction to enter such final order or judgment absent the

consent of the parties.

## BACKGROUND

4.       On June 29, 2016 (the "**Petition Date**"), each of the Debtors commenced a case

by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"**Chapter 11 Cases**"). The Chapter 11 Cases are jointly administered.

5.       The Debtors continue to manage and operate their business as debtors in

possession pursuant to Bankruptcy Code sections 1107 and 1108.

---

[3]       Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable
Caliber Contracts (as defined below) or, if not defined therein, in the First Day Declaration (as defined below).

6.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the United States Trustee for the District of Delaware (the "**U.S. Trustee**"). No trustee or examiner has been appointed in the Chapter 11 Cases.

7.      TUSA and its Debtor subsidiaries comprise an independent, growth-oriented oil and gas exploration and development company emphasizing the acquisition and development of unconventional shale oil and natural gas resources in the Williston Basin of North Dakota and Montana. TUSA is a wholly owned subsidiary of Triangle Petroleum Corporation ("**TPC**"), a vertically integrated, independent energy company with three lines of business. In addition to TUSA's exploration and production business, TPC's wholly owned, non-Debtor subsidiary RockPile Energy Services, LLC and its affiliates provide oilfield services, focusing particularly on hydraulic pressure pumping and complementary services. Finally, TPC's joint venture, Caliber Midstream Partners, L.P., and its affiliates provide crude oil, natural gas, and fresh and produced water gathering, processing, and transportation services to TUSA and other customers in the Williston Basin. In addition to its three principal business lines, Triangle formerly operated a fabrication enterprise through Debtor Ranger Fabrication, LLC ("**Ranger**") and its subsidiaries. Ranger ceased operations in early 2016 and has commenced Chapter 11 Cases alongside its sister company, TUSA, in order to complete an orderly wind down.

8.      On June 29, 2016, the Debtors entered into a plan support agreement (the "**PSA**") with the holders (collectively, the "**Ad Hoc Noteholder Group**") of approximately 73% in aggregate principal amount of TUSA's 6.75% senior unsecured notes (the "**TUSA Notes**"). Pursuant to the PSA, the Ad Hoc Noteholder Group has agreed to support a pre-arranged chapter 11 plan under which the Debtors will substantially deleverage their balance sheets by, among other things, exchanging the TUSA Notes for equity interests in reorganized TUSA. To enhance

3

liquidity and position the reorganized Debtors to capture growth opportunities as market conditions rebound, the PSA further contemplates a new-money rights offering backstopped by members of the Ad Hoc Noteholder Group. Triangle's business operations, corporate and capital structure, and restructuring efforts are described in greater detail in the *Declaration of John R. Castellano in Support of Chapter 11 Petitions and First Day Papers* [Docket No. 13] (the "**First Day Declaration**").

<b>RELIEF REQUESTED</b>

9.       By this Motion, the Debtors seek entry of an order (the "**Order**"), substantially in the form attached hereto, authorizing, but not directing, the Debtors to reject one or more of the Specified Caliber Contracts identified on **Exhibit A** attached hereto, as determined by the Debtors in their sole discretion, effective on the tenth day after service of a notice substantially in the form attached hereto as **Exhibit B** (the "**Rejection Notice**") on Caliber North Dakota, Caliber Measurement, or Caliber Fresh Water, as applicable (each as defined below), identifying the Specified Caliber Contract(s) to be rejected (as defined in the Rejection Notice, the "**Rejection Date**"). The Debtors will serve any such Rejection Notice, accompanied by a copy of this Order, on Caliber's counsel in the Chapter 11 Cases by email, facsimile, overnight delivery, or hand delivery. The Debtors will serve a copy of the Rejection Notice on (a) the U.S. Trustee, (b) counsel to the TUSA RBL Agent, (c) counsel to the TUSA Unsecured Notes Trustee, (d) counsel to the Ad Hoc Noteholder Group, (e) counsel to TPC, and (f) counsel to any creditors' committee appointed in the Chapter 11 Cases (collectively, the "**Notice Parties**"). The Debtors further request that they be authorized, in their sole discretion, to rescind any Rejection Notice by serving notice of the same on the applicable Caliber entity before the Rejection Date (a "**Notice of Rescindment**") and that the applicable Rejection Notice be deemed null and void *ab initio* upon timely service of a Notice of Rescindment. Finally, the Debtors request that Caliber

4

North Dakota, Caliber Measurement, or Caliber Fresh Water, as applicable, have until the later of (x) the general bar date established in the Chapter 11 Cases for filing proofs of prepetition general unsecured claims or (y) 30 days from the applicable Rejection Date to file a proof of claim for damages arising from rejection of the Specified Caliber Contracts identified in the applicable Rejection Notice.

**BASIS FOR RELIEF**

**A.    The Caliber Joint Venture and Gathering System**

10.    Oil and gas operators rely on a variety of gathering, transportation, and similar "midstream services" to convey produced oil and gas from the wellhead to points of sale or delivery in a marketable state. Because gathering infrastructure in the Williston Basin remains relatively undeveloped, Williston Basin operators have, compared to operators in more established plays, relied disproportionately on trucking for crude oil gathering, produced water gathering, and fresh water delivery, and flaring for natural gas. Over the long term—particularly during periods of robust pricing and expanding production—pipeline gathering systems have a number of economic, operational, and environmental advantages over trucking. Thus, the Debtors' long-term growth strategy contemplated the replacement of trucking with pipeline gathering. The Debtors believed that proactively transitioning to pipeline gathering could confer significant advantages over competing operators. To that end, in October 2012, Triangle entered into a joint venture with First Reserve Caliber Holdings LLC ("**First Reserve**") to form Caliber and construct a pipeline gathering system to service TUSA and third-party wells in the Williston Basin.

11.    The Caliber system provides a suite of gathering services, including crude oil gathering, stabilization, and transportation; natural gas gathering and processing and natural gas liquids takeaway; produced water transportation and disposal; fresh water and maintenance water

5

delivery; and measurement services, storage, and other ancillary offerings. Caliber's infrastructure consists of over 300 miles of gathering pipeline, crude oil stabilization facilities, long-distance pipeline interconnects, natural gas refrigeration facilities, produced water disposal wells, and other facilities. As of January 31, 2016, 111 of the Debtors' operated wells were connected to one or more service lines provided by Caliber. The Caliber system is concentrated in or around the Debtors' core acreage in McKenzie County, North Dakota. Most of the Debtors' operated wells in Williams County, North Dakota and elsewhere are largely serviced by other midstream providers.[4] While Caliber provides services to some third-party operators and is actively seeking other third-party business, TUSA historically has accounted for approximately 90% of Caliber's revenue.

12.     Caliber is organized as a limited partnership managed by its general partner, Caliber Midstream LP, LLC ("**Caliber GP**"). Triangle, through its wholly owned subsidiary Triangle Caliber Holdings, LLC, and First Reserve each hold a 50% interest in Caliber GP and share equal governance rights. However, First Reserve holds approximately 71.7% of the economic interests in Caliber (represented by Class A limited partnership units), with Triangle holding the remaining 28.3%.

**B.     The Caliber Midstream Agreements**

13.     The Debtors' arrangements with Caliber are set forth in several long-term midstream services agreements (the "**Caliber MSAs**") and a separate revenue commitment agreement (the "**Revenue Commitment Agreement**" and, together with the Caliber MSAs, the "**Caliber Contracts**"). The two most significant of the Caliber MSAs in terms of cost concern

---

[4]     The Debtors' Produced Water Agreements (as defined below) with Caliber North Dakota LLC, d/b/a Caliber Midstream North Dakota LLC ("**Caliber North Dakota**") concern services for the Debtors' operations in Williams County, North Dakota.

gathering and related services for crude oil, and gas and water (respectively, the "**Crude Oil MSA**," and the "**Gas and Water MSA**").[5] In addition, the parties have entered into several ancillary agreements for measurement and transfer services (the "**LACT Agreement**"),[6] natural gas liquids handling (the "**NGL Handling Agreement**"),[7] fresh water sales (the "**Fresh Water Agreement**"),[8] and produced water gathering and disposal services (collectively, the "**Produced Water Agreements**").[9] Finally, TUSA and Caliber are party to a Revenue Commitment Agreement under which TUSA committed to deliver specified minimum monthly revenues to Caliber under the Crude Oil MSA and Gas and Water MSA.[10]

14.     By this Motion, the Debtors seek authorization, but not direction, to reject the Specified Caliber Contracts—specifically, the Crude Oil MSA, the Gas and Water MSA, the LACT Agreement, the NGL Handling Agreement, the Fresh Water Agreement, and the Revenue Commitment Agreement. The Debtors do not, by this Motion, seek authorization to reject the

---

[5]     "**Crude Oil MSA**" refers, more particularly, to that certain Amended and Restated Midstream Services Agreement (Crude Oil) dated September 12, 2013, by and between Caliber North Dakota and TUSA. "**Gas and Water MSA**" refers, more particularly, to that certain Amended and Restated Midstream Services Agreement dated September 12, 2013, by and between Caliber North Dakota and TUSA.

[6]     "**LACT Agreement**" refers, more particularly, to that certain Gathering Services Agreement (LACT Units) dated September 12, 2013, by and between Caliber Measurement Services LLC ("**Caliber Measurement**") and TUSA.

[7]     "**NGL Handling Agreement**" refers, more particularly, to that certain NGL Handling Agreement dated June 16, 2015, by and between Caliber North Dakota and TUSA.

[8]     "**Fresh Water Agreement**" refers, more particularly, to that certain Fresh Water Sales Agreement dated May 13, 2014, by and between Caliber Midstream Fresh Water Partners LLC ("**Caliber Fresh Water**") and TUSA.

[9]     "**Produced Water Agreements**" refers, more particularly, to (a) that certain Produced Water Disposal Agreement dated June 16, 2015, by and between Caliber North Dakota and TUSA; (b) that certain Strand Salt Water Disposal Well Services Agreement dated June 16, 2015, by and between Caliber North Dakota and TUSA; and (c) that certain Gathering Services Agreement (Produced Water) dated June 16, 2015, by and between Caliber North Dakota and TUSA.

[10]    "**Revenue Commitment Agreement**" refers, more particularly, to that certain Revenue Commitment Agreement dated September 12, 2013, by and between Caliber North Dakota and TUSA. References to any agreement herein should be construed as references to such agreement as amended, supplemented, or otherwise modified from time to time. Any summary of any agreement herein is for the convenience of the Court and the parties in interest in the Chapter 11 Cases and is qualified in its entirety by the terms of such agreement.

Produced Water Agreements (but do not seek authorization to assume them, either). The Caliber Contracts are outlined in the following paragraphs; additional information concerning the Caliber Contracts is set forth in the Castellano Declaration.

### (i)    *The Crude Oil MSA*

15.    Under the Crude Oil MSA, Caliber North Dakota provides TUSA crude oil gathering, stabilization, treatment, and redelivery services. TUSA pays specified rates by volume for such services and "well connect" fees for each well connected to the crude oil, gas, or water gathering system. The Crude Oil MSA has a 15-year primary term and renews thereafter for successive terms of one year until cancelled.[11]

16.    The Crude Oil MSA provides that Caliber will be the exclusive provider of the specified midstream services for crude oil produced from certain oil and gas leases defined in the Crude Oil MSA "**Dedicated Properties**."[12] The Crude Oil MSA purports that TUSA's "dedication" of the Dedicated Properties is a covenant that "runs with the land" under North Dakota law. The Debtors dispute this conclusion and contend that the "dedication" is merely an *in personam* exclusive-dealing obligation.

### (ii)    *The Gas and Water MSA*

17.    Under the Gas and Water MSA, Caliber North Dakota provides TUSA gas gathering, compression, dehydration, and transportation services; fresh water delivery services; and produced water transportation and disposal services. TUSA pays specified rates by volume

---

[11]    The 15-year primary term commenced on the "in-service" date of the applicable Caliber facilities, which occurred in September 2014.

[12]    The Dedicated Properties comprise "Phase 1 Dedicated Properties" and "Phase 2 Dedicated Properties," the later referring to properties that were "dedicated" in connection with the expansion of the Caliber system in 2013. The Dedicated Properties are concentrated in and around the Debtors' core acreage in McKenzie County, North Dakota.

for such services and "well connect" fees for each well connected to the crude oil, gas, or water gathering system. The Gas and Water MSA has a 15-year primary term and renews thereafter for successive terms of one year until cancelled.[13]

18.     The Gas and Water MSA provides that Caliber will be the exclusive provider of the specified midstream services for gas produced from certain oil and gas leases defined in the Gas and Water MSA as "Phase 1 Dedicated Properties."[14] The Gas and Water MSA purports that TUSA's "dedication" of the Dedicated Properties is a covenant that "runs with the land" under North Dakota law. The Debtors dispute this conclusion and contend that the "dedication" is merely an *in personam* exclusive-dealing obligation.

        *(iii)*       *LACT Agreement*

19.     Pursuant to the LACT Agreement, Caliber installs and maintains LACT units (short for "lease automatic custody transfer") at TUSA-operated wells on the Dedicated Properties. A LACT unit is a pump and meter combination that measures the volume and quality of produced hydrocarbons as they are transferred downstream—for example, as they move from the wellsite to the gathering system. Like the Crude Oil MSA and the Gas and Water MSA, the LACT Agreement provides that Caliber will be the exclusive provider of LACT units and related services to TUSA with respect to the Dedicated Properties. TUSA pays a monthly fee by volume for these services.

---

[13]    The 15-year primary term commenced on the "in-service" date of the applicable Caliber facilities, which occurred in April 2014 for the Gas and Water MSA.

[14]    In other words, unlike the Crude Oil MSA, TUSA's exclusivity agreement under the Gas and Water MSA applies only to the "Phase 1 Dedicated Properties."

### *(iv)    NGL Handling Agreement*

20.    The NGL Handling Agreement provides for the transport and pump-over of TUSA-produced natural gas liquids ("**NGLs**") on Caliber's NGL pipeline, which interconnects with an interstate pipeline operated by another midstream provider. Caliber's NGL pipeline is regulated by the Federal Energy Regulatory Commission ("**FERC**"), and TUSA pays for transport at the FERC-authorized tariff rate, plus a set pumping fee. Unlike the Crude Oil MSA and the Gas and Water MSA, the NGL Handling Agreement contains no exclusive dealing or "dedication" provisions.

### *(v)    Fresh Water Agreement*

21.    The Fresh Water Agreement is a contract for the sale of fresh water from Caliber Fresh Water to TUSA (which requires large volumes of fresh water for hydraulic fracturing and other exploration and production activities). TUSA pays for fresh water under the Fresh Water Agreement at a specified rate per barrel. While the Fresh Water Agreement obligates TUSA to procure fresh water exclusively from Caliber Fresh Water, it does not purport to "dedicate" any properties or otherwise "run with the land."

### *(vi)    Revenue Commitment Agreement*

22.    The Revenue Commitment Agreement requires that TUSA deliver specified minimum monthly revenue to Caliber under the Crude Oil MSA and Gas and Water MSA. Any shortfall in TUSA's service fees under the Crude Oil MSA and Gas and Water MSA in a given month relative to the minimum revenue commitment for that month is payable as a "Deficit Fee" under the Revenue Commitment Agreement. Conversely, TUSA may accrue credits against future monthly commitments to the extent actual monthly revenues exceed the minimum revenue commitment in a given month. As of April 30, 2016, TUSA had accrued a cumulative credit of $41.5 million. Credits may be carried forward for a period of four years from the date of accrual.

The Revenue Commitment Agreement terminates when the actual monthly revenues and deficit fees equal the aggregate minimum revenue commitment. The aggregate minimum revenue commitment over the term of the agreements is $405.0 million, of which $293.7 million was outstanding as of April 30, 2016.[15]

(vii)    <b>Produced Water Agreements</b>

23.     The Produced Water Agreements concern services related to the gathering and disposal of produced water—a byproduct of oil and gas production that requires careful handling and disposal—for the Debtors' operations in Williams County, North Dakota. As noted above, the Debtors do not, by this Motion, seek authority to assume or reject the Produced Water Agreements.

## C.    Authorization to Reject Certain Caliber Contracts

24.     Initially envisioned as a long-term solution to the infrastructural challenges of operating in the Williston Basin, which would give the Debtors a substantial advantage over other operators, the Specified Caliber Contracts are now an albatross on the Debtors' business. The Debtors pay a fixed, per volume rate for each of the Caliber service lines. These rates, negotiated during a period of robust commodity prices and rapid production growth in the

---

[15]    The Revenue Commitment Agreement is listed on **Exhibit A** out of an abundance of caution, and its inclusion should not be construed as a concession that the Revenue Commitment Agreement is an executory contract. A contract is executory if the obligations "of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *In re Trump Entm't Resorts, Inc.*, 526 B.R. 116, 121 (Bankr. D. Del. 2015) (quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)). The Revenue Commitment Agreement may not be an executory contract under this definition insofar as Caliber does not appear to have any material unperformed obligations thereunder. In this regard, the Revenue Commitment Agreement may simply represent a non-executory general unsecured claim against TUSA. But because rejection of an executory contract constitutes a deemed breach of that contract as of the petition date, entitling the counterparty to a general unsecured claim for contract damages (subject to any applicable defenses of the debtor), the characterization of the Revenue Commitment Agreement as an executory or non-executory contract has no practical impact on Caliber's rights: under either scenario, Caliber would be entitled to no more than a general unsecured claim for the remaining aggregate revenue commitment. Authorization to reject the Revenue Commitment Agreement will simply remove any ambiguity that Caliber's entitlement to minimum monthly revenues constitutes a general unsecured claim against TUSA.

Williston Basin, do not account for the unprecedented market conditions E&P operators have endured over the past 18 months. A principal objective of the Debtors' restructuring efforts is to realign the Debtors' gathering, transportation, and processing costs with these new market realities.

25.    Before filing these cases, the Debtors carefully considered their strategic and operational alternatives for midstream services and their relationship with Caliber. The Debtors concluded that their existing arrangements with Caliber are well above current market terms and, accordingly, the Debtors evaluated a variety of options either to amend the economic terms of the Specified Caliber Contracts to match prevailing market conditions or to procure midstream services from other providers at market rates. As discussed in the First Day Declaration, the Debtors attempted to engage with Caliber concerning a global solution that would address the Debtors' midstream economics as one component of a consolidated restructuring transaction among Caliber, TUSA and TPC creditors, and other stakeholders. The Debtors also indicated that, as an alternative to a more comprehensive transaction, they would be amenable to a simple, bilateral transaction to amend the terms of the Specified Caliber Contracts.

26.    Unfortunately, these discussions were not fruitful. The Debtors therefore undertook a thorough evaluation of operational alternatives to Caliber. The Debtors determined that they can procure suitable midstream services from third-party providers at substantially lower cost and can transition to new providers or other alternatives rapidly and with relatively little business disruption. The Debtors remain willing to reengage with Caliber toward a mutually acceptable solution. But in the event a consensual resolution cannot be reached, and the Court authorizes the rejection of the Specified Caliber Contracts, TUSA is prepared to implement alternative midstream arrangements immediately.

D.      **The Adversary Proceeding**

27.      On May 27, 2016, Caliber North Dakota filed a complaint against TUSA in the

North Dakota District Court for the Northwest Judicial District for a declaratory judgment that

the "dedications" in the Crude Oil MSA and the Gas and Water MSA "run with the land" under

North Dakota law. *See* Compl. ¶ 19, *Caliber N.D. LLC v. Triangle USA Petroleum Corp.*, Civil

Case No. 27-2016-CV-00218 (N.D. Dist. Ct. May 27, 2016) (the "**Caliber Complaint**"). Caliber

filed the Caliber Complaint in anticipation of—and with the evident intent of thwarting—the

relief sought in this Motion. *See* Caliber Compl. ¶ 16 (noting that the Caliber Complaint was

filed in expectation of TUSA filing for bankruptcy and seeking to reject the Crude Oil MSA and

the Gas and Water MSA). Indeed, because the Caliber Complaint when filed was, on its face,

wholly anticipatory of the Debtor's bankruptcy filing and of this rejection Motion, that action has

no independent existence apart from these proceedings. Accordingly, concurrently with the filing

of this rejection motion, TUSA has sought to transfer the Caliber Complaint to this Court to be

dismissed or consolidated with proceedings in this Court.[16] To that end, following the filing of

this Motion, TUSA will commence an adversary proceeding (the "**Adversary Proceeding**")

against Caliber in this Court by filing a *Complaint for Declaratory Judgment* that the Specified

Caliber Contracts do not contain covenants or equitable servitudes that run with the land.

28.      This Motion and the Adversary Proceeding should be adjudicated in tandem. As a

technical matter, this Court could authorize the rejection of the Specified Caliber Contracts

without first determining whether the "dedications" run with the land; however, a ruling to that

effect would leave both parties uncertain as to the Debtors' ongoing obligations under the

---

[16]      More particularly, TUSA filed a notice of removal removing the Caliber action to the United States District
Court for the District of North Dakota pursuant to 28 U.S.C. § 1452 and a motion to transfer venue to the
United States District Court for the District of Delaware, for subsequent reference to this Court, pursuant to 28
U.S.C. § 1412.

Specified Caliber Contracts. *See In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 74 (Bankr.

S.D.N.Y. 2016) (noting that "rejection of the [debtor's gathering agreements] relieves the

Debtors of those terms that are subject to rejection . . . whether that be some or all of the

terms . . . as will be decided in a subsequent proceedings or agreed to by the parties"). Absent a

declaratory judgment that the "dedications" do not run with the land, Caliber likely would argue

that the Debtors' exclusive-dealing obligations would survive the rejection of the applicable

contracts. Because the Debtors' ability to reject the Specified Caliber Contracts under

Bankruptcy Code section 365(a), and the effect of rejection under North Dakota law, are so

intertwined, this Motion should be heard simultaneously with dispositive motions in the

Adversary Proceeding.

## APPLICABLE AUTHORITY

**A.      Rejection of the Specified Caliber Contracts Is Authorized by Section 365(a) of the Bankruptcy Code.**

29.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession,

"subject to the court's approval, may . . . reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. § 365(a); *see also Univ. Med. Ctr.. v. Sullivan (In re Univ. Med. Ctr.)*, 973

F.2d 1065, 1075 (3d Cir. 1992).

30.      A debtor's determination to reject an executory contract is governed by the

"business judgment" standard. *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D.

Del. 2003) (stating that a debtor's decision to reject an executory contract is governed by the

business judgment standard and can only be overturned if the decision was the product of bad

faith, whim, or caprice). Once the debtor articulates a valid business justification, "[t]he business

judgment rule 'is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

14

best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res.,*
*Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van*
*Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

31.    The business judgment rule shields a debtor's management from judicial second-
guessing. *See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In*
*re Johns-Manville Corp.),* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the
continued operation of a business by a debtor and a presumption of reasonableness attaches to a
debtor's management decisions."); *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849
(Bankr. W.D. Pa. 1987) ("[T]he court should not interfere with or second guess the debtor's
sound business judgment unless and until evidence is presented that establishes that the debtor's
decision was one taken in bad faith or in gross abuse of its retained business discretion.").

32.    As discussed above, the Debtors, with the assistance of their advisors, have
reviewed and analyzed their strategic and operational alternatives for midstream services and
their relationship with Caliber. *See* Castellano Declaration ¶¶ 18, 21. The Debtors concluded that
their existing arrangements with Caliber are well above current market rates and unduly
burdensome to their estates. *See id.* ¶¶ 19-20. The Debtors also determined that they can procure
suitable midstream services from third-party providers at substantially lower cost and can
transition to new providers rapidly and with relatively little business disruption, despite potential
disadvantages of such alternatives. *See id.* ¶ 20.

33.    Not only are the actual service fees under the applicable Caliber MSAs off
market, under the Revenue Commitment Agreement, the Debtors are obligated to pay deficit fees
for each month in which they fail to meet the specified minimum monthly revenues and no
credits are available. *See id.* Thus, the Debtors potentially will be obligated to pay fees for

services they do not receive—even during a Gatherer Force Majeure Event (as defined in the Revenue Commitment Agreement) wherein Caliber is unable to provide the contracted services to the Debtors. Moreover, all of the Caliber MSAs at issue—aside from the NGL Handling Agreement[17]—require that the Debtors exclusively contract with Caliber for the services provided thereunder. *See id.* ¶¶ 7, 11, 13, 15. As a result, in the current commodity price environment that has resulted in a significant reduction in market rates for services, the Debtors have no ability to negotiate for such services with third parties at lower rates. *See id.* ¶ 20. For these reasons, authorization to reject the Specified Caliber Contracts is critical to the Debtors' overarching objective of emerging from bankruptcy with a strong foundation for long-term growth and profitability. *See id.* ¶¶ 20-21.

**B.    The Proposed Rejection Procedures Are Fair and Reasonable.**

34.    As reflected in the proposed order filed herewith, the Debtors propose that they be authorized to reject one or more of the Specified Caliber Contracts effective on the tenth day after service of a Rejection Notice on Caliber (with a copy to the Notice Parties). This procedure will afford Caliber adequate notice of rejection and an opportunity to object, and thus meets the requirements of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. Similar relief has been granted by other courts. *See, e.g.*, Order, *In re Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. June 19, 2015), ECF No. 698, ¶ 34 (authorizing debtor to reject executory contracts effective on the fifth day after delivery of notice to the applicable counterparty); Order, *In re Kmart Corp.*, Case No. 02-B02474 (Bankr. N.D. Ill. Jan. 25, 2002), ECF No. 139, ¶ 1.

---

[17]    The services provided under the NGL Handling Agreement are closely related to those provided under the Gas and Water MSA. Accordingly, in their sound business judgment, the Debtors determined that they would no longer require the NGL handling services if and when the Gas and Water MSA is rejected.

## RESERVATION OF RIGHTS

35.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same, other than the Specified Caliber Contracts; (b) direction to reject any executory contracts between TUSA and Caliber; (c) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (d) a promise to pay any claim; (e) granting third-party beneficiary status or bestowing any additional rights on any third party; or (f) being otherwise enforceable by any third party.

## NOTICE

36.     Notice of this Motion will be given to: (a) the U.S. Trustee, (b) counsel to the TUSA RBL Agent, (c) counsel to the TUSA Unsecured Notes Trustee, (d) counsel to the Ad Hoc Noteholder Group, (e) counsel to Caliber, (f) counsel to TPC, (g) the parties included on the Debtors' consolidated list of the 20 largest unsecured creditors, and (h) all parties entitled to notice pursuant to Bankruptcy Rule 2002(b) and Local Bankruptcy Rule 2002-1. The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

37.     No previous request for the relief sought herein has been made to this Court or any other court.

**CONCLUSION**

The Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto, granting the relief sought herein and granting such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
July 5, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Sarah E. Pierce*
Sarah E. Pierce (I.D. No. 4648)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

– and –

Albert L. Hogan, III *(pro hac vice pending)*
George N. Panagakis
Ron E. Meisler
Christopher M. Dressel
Renu P. Shah
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*