UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|   |   |
|---|---|
| IN RE: | . Chapter 11 |
|  | . |
|  | . Case No. 16-11566(MFW) |
| TRIANGLE USA PETROLEUM | . |
| CORPORATION, et al, | . |
|  | . Courtroom No. 4 |
|  | . 824 Market Street |
| Debtors. | . Wilmington, Delaware 19801 |
|  | . |
| . . . . . . . . . . . . . . . . . | . Thursday, November 10, 2016 |

TRANSCRIPT OF MOTION OF DEBTORS FOR ORDER UNDER BANKRUPTCY CODE
SECTIONS 105 AND 362, EXTENDING THE AUTOMATIC STAY TO
ARBITRATION PROCEEDINGS COMMENCED BY SLAWSON EXPLORATION
COMPANY, INC., AGAINST TRIANGLE PETROLEUM CORPORATION
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Sarah E. Pierce, Esq.
                            SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                            One Rodney Square
                            Wilmington, Delaware 19801

                            Christopher M. Dressel, Esq.
                            SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                            155 North Wacker Drive
                            Chicago, Illinois 60606

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Brandon McCarthy, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:   (Continued)

For Slawson Exploration:        Thomas Horan, Esq.
                                SHAW, FISHMAN, GLANTZ & TOWBIN, LLC
                                919 North Market Street, Suite 600
                                Wilmington, Delaware 19801

                                Steven A. Abelman, Esq.
                                BROWNSTEIN HYATT FARBER
                                 SCHRECK, LLP
                                410 Seventeenth Street
                                Denver, Colorado 80202

For the Ad Hoc Committee
of Noteholders:                 Andrew L. Magaziner, Esq.
                                YOUNG, CONAWAY, STARGATT
                                 & TAYLOR, LLP
                                Rodney Square
                                1000 North King Street
                                Wilmington, Delaware 19801

For Wells Fargo:                Ericka F. Johnson, Esq.
                                WOMBLE, CARLYLE, SANDRIDGE
                                 & RICE, LLP
                                222 Delaware Avenue, Suite 1501
                                Wilmington, Delaware 19801

APPEARANCES VIA TELEPHONE:

For the Debtors:                Albert L. Hogan, Esq.
                                Jay E. Mitchell, Esq.
                                Renu Shah, Esq.
                                SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM, LLP

                                Jessica L. Fuller, Esq.
                                James M. Lyons, Esq.
                                LEWIS ROCA ROTHBERGER CHRISTIE, LLP

For Wells Fargo:                William A. Wood, III, Esq.
                                Jennifer Feldsher, Esq.
                                BRACEWELL, LLP

For Wilmington Trust:           Daniel J. Saval, Esq.
                                BROWN RUDNICK, LLP

(Appearances Continued)

ALSO APPEARING VIA TELEPHONE:

                          Ashley Garber
                          Ryan D. McGee
                          TRIANGLE PETROLEUM CORPORATION

INDEX

                                                        Page

ARGUMENT BY MR. DRESSLER                                   5

ARGUMENT BY MR. ABELMAN                                   13

FURTHER ARGUMENT                                          22

COURT DECISION                                            25

1          (Proceedings commence at 11:35 a.m.)

2          (Call to order of the Court)

3                THE COURT OFFICER:  You may be seated.

4                THE COURT:  Good morning.

5                MR. DRESSEL:  Good morning, Your Honor.  Christopher

6     Dressel of Skadden Arps on behalf of the debtor Triangle USA

7     Petroleum Corporation and its affiliated debtors.

8                I want to thank Your Honor for flexibility on

9     scheduling and for hearing us today outside of our regularly

10    scheduled omnibus hearing.

11               THE COURT:  And I'm sorry that my illness prevented us

12    from going forward on Tuesday.

13               MR. DRESSEL:  We certainly understand, and we hope

14    Your Honor is on the mend.

15               THE COURT:  I am.

16               MR. DRESSEL:  Your Honor, we're here today, and the

17    reason we felt compelled to ask Your Honor to hear us outside

18    of our omnibus hearing is that this matter is very significant,

19    from our perspective, from the reorganization process and the

20    plan process that we're pursuing.

21               The briefs raise a number of technical legal issues

22    about the circumstances in which extending the automatic stay

23    is appropriate.  I think we have strong responses, and I'll get

24    to those.  But I thought it would be helpful at the onset to

25    try and put this into context and articulate the importance of

1    this dispute for our process.

2         We're hard at work negotiating a Chapter 11 plan with

3    our key stakeholders.  We intend to file a plan next Tuesday,

4    the 15th, and we intend to seek approval of a disclosure

5    statement by January 15th, all consistent with the milestones

6    in our cash collateral order.

7         As part of that process, Your Honor, we have to deal

8    with significant claims like the Slawson proof of claim and the

9    related TPC proof of claim, which were both filed around the

10   claims bar date on October 12th.  We think that the amount of

11   the claim, $35 million, is significantly overstated.  And we

12   feel compelled, out of fairness to our other stakeholders, to

13   begin a process in this court of litigating that claim, either

14   by seeking estimation of the claim or by filing an objection.

15   And we intend to do that shortly.  And we intend to do that

16   regardless of whether of the arbitration proceeds because these

17   stakeholders have filed proofs of claim in this court, and we

18   intend to deal with them appropriately in this court.

19        But why we're here today is because, while we need to

20   deal with these claims, we need to deal with them in a manner

21   that is fair to all of our stakeholders.  And that entails the

22   debtor having a full and fair opportunity to litigate those

23   claims on the merits, without being prejudiced by parallel

24   litigation, as proceeding in another forum that the debtor is

25   not a participant in.

1          And I want to pause and dwell on that last point, when

2    I say that there's "parallel litigation" involving the same

3    claim in another forum because that is an issue that's lost in

4    the dispute in this opposition to this motion.

5          Slawson is claiming that the claims that against TPC

6    that are at issue in the arbitration are independent, that they

7    rest on separate theories.  And candidly, Your Honor, we

8    believe that that is a gross exaggeration.  The claims are

9    substantially the same.  And let there be no mistake, this

10   arbitration is, in large part, about TUSA's liability, even

11   though TUSA is not a party.

12         Really, the only distinction between the claim that is

13   asserted against TPC in the arbitration and the claim that is

14   asserted against TUSA by the same party in this court is that

15   the claim against TUSA, in addition to the other elements, is

16   alleged to have arisen by virtue of an assignment of the

17   obligations under the contract, either through an express

18   contractual assignment, or through the assignment on the leases

19   on the theory that the covenants in a contract run with the

20   land, and that's really the only distinction.

21         The underlying obligation that is asserted, the

22   obligation to promote payments with respect to certain wells

23   that are operated by TUSA, those are the same allegations, the

24   same contractual claims that are articulated against both TPC

25   and TUSA, and they arise from the same contract.

1          And in fact, if one were to look at the arbitration

2     demand that Slawson filed, initially, it did assert, expressly,

3     a claim for monetary relief against TUSA.  The only thing that

4     Slawson did is they redefined the term "Triangle," so that it

5     ceased to refer to both TPC and TUSA, and from that point on

6     referred only to TPC.

7          And then, in certain points, they allege that, instead

8     of making allegations directly against TUSA, they made

9     allegations against TPC, acting through its agent, TUSA.  So I

10    think the theory that there are actually separate claims here

11    is really -- it doesn't stand up to scrutiny and is just a

12    matter of artful pleading in the arbitration forum.

13         And Judge Walsh said in the <u>American Film Technologies</u>

14    cases, in granting a similar motion to extend the stay:

15         "The two causes of action are merely different legal

16          theories cloaking the same facts."

17         He could have written the same thing about this

18    dispute here.

19         So why is it important that these claims are

20    overlapping, and why does that prejudice TUSA?  I think for two

21    reasons:  First of all, because there is a significant risk, we

22    feel, of collateral estoppel.

23         THE COURT:  How?  You're not a party.

24         MR. DRESSEL:  It's correct that we're not a party.

25    But as Judge Walsh observed in the <u>American Film</u> case,

1    collateral estoppel does not require a strict identity of

2    parties.  There are circumstances in which it can be asserted

3    against a nonparty, particularly in some circumstances where

4    the parties are affiliates, which is certainly the case between

5    TPC and TUSA; and also, where one party is alleged to be a

6    privy of another.

7         So the typical formulation of collateral estoppel is

8    not involving the same parties; it's actually involving the

9    same parties or their privies.  And Slawson is alleging

10   explicitly in the opposition it filed in this court that TUSA

11   is a privy of TPC.  So we think there is a risk of collateral

12   estoppel here.

13        And to be fair, Your Honor, it may be that there is

14   some nuance, and it may be that there is no definitive

15   conclusion today, as to whether collateral estoppel applies.

16   But Your Honor doesn't actually have to reach the merits of

17   that issue.  I think Your Honor just needs to recognize that

18   there's a substantial risk.

19        And that's what the Third Circuit said in the W.R.

20   Grace case; it says, and I quote:

21             "Plaintiff's counsel's theory that, under a

22             principal/agent analysis, the absence of Grace" --

23             Grace, being the debtor.

24             "-- would protect it from collateral estoppel to not

25             be tested at Grace's peril."

1        And we're asking Your Honor to make the same ruling

2    here.

3        TPC has not waived its right to assert collateral

4    estoppel.  We believe it would assert collateral estoppel in

5    this court if it were advantageous for it to do so.  And we

6    believe that there is a substantial risk on that issue, based

7    on the fact that the boundaries of that doctrine are somewhat

8    fuzzy at the margins when you're talking about parties like TPC

9    and TUSA, who are affiliates of one another, and who are

10   alleged to be privies of one other; both privies from a

11   contractual perspective, on the grounds that perhaps there was

12   assignment of these contracts, which is one theory, or on the

13   grounds of privity of estate, on the theory, which we would

14   dispute, but it's certainly a theory that is articulated, that

15   the obligations in the promote ran with the land, on the

16   grounds that TUSA is in privity of estate with TPC.

17       So, for that reason, we do believe that there is a

18   genuine concern as to collateral estoppel here, and we believe

19   that that concern has been recognized as a legitimate basis to

20   extend the stay by other courts in this jurisdiction, including

21   Judge Gross' decision in the SM Liquidation case, and Judge

22   Walsh's decision in the American Film case, which was

23   predicated in large part on collateral estoppel.  And indeed,

24   Judge Walsh said that collateral estoppel was the, quote,

25   "overriding basis" for justifying extension of the automatic

1    stay.

2         But there's also another basis for extending the stay

3    here, Your Honor, and that is does -- the claim of

4    indemnification from TPC against TUSA.  And of courts have also

5    recognized that as a legitimate basis for extending the stay.

6         Let me, at the beginning, pause to address the claim

7    that an indemnification claim is not a valid basis to extend

8    the stay if it's not, quote, "absolute."  That is not what

9    courts in this district have held.  And in fact --

10        THE COURT:  What is the basis for the indemnification

11   claim?

12        MR. DRESSEL:  It would be -- it's not fully

13   articulated, but we believe it's a common law claim of

14   indemnification, on the grounds that, if a judgment were issued

15   against TPC, if TPC could prove that the obligation had been

16   assigned to TUSA, either on a real property theory or a

17   contractual theory, such that TUSA actually had its own

18   obligation under the contract, then, under a common law or

19   equitable or implied indemnification theory, TPC would be

20   entitled to seek either contribution or indemnification from

21   TUSA.  And to be clear, Your Honor, we would dispute that.  We

22   don't believe that they have a clear right to indemnification.

23        But what courts in this district have recognized is

24   that you don't need to have a clear or absolute right to

25   indemnification in order to justify extension of the automatic

1    stay.  And in fact, I think that Judge Walsh had it exactly

2    right in the American Film case, when he said that the fact

3    that indemnification is disputed, that's exactly the -- that's

4    exactly the point, and that's why it's not fair to allow

5    litigation in another forum, where those issues are going to be

6    resolved without the debtor's participation to continue.

7         And just so here.  We do not want an arbitrator trying

8    to deal with issues of apportionment of liability as between

9    TPC and TUSA, which may give rise to an indemnification claim,

10   to be adjudicated without our right to participate and our

11   right to defend ourselves.  So, in that sense, I think that

12   there is a sufficient identity of interest, based on

13   indemnification, to justify the automatic stay, particularly

14   when you layer that on top of the substantial risk of

15   collateral estoppel.

16        Your Honor, I think I'll stop there, reserving some

17   time for rebuttal, if appropriate, unless Your Honor has any

18   questions.

19        THE COURT:  I do not.

20        MR. DRESSEL:  Thank you.

21        MR. HORAN:  Good morning, Your Honor.  Thomas Horan

22   from Womble -- I'm sorry -- from Shaw, Fishman, Glantz & Towbin

23   for Slawson Exploration Company.  Ms. Johnson threw me off.

24   I'm joined here today at counsel table by Steven Abelman from

25   the Brownstein Hyatt Farber Schreck firm in Denver, Colorado.

1    Your Honor has admitted him to practice *pro hac vice*, and I ask

2    that he be heard with respect to this.

3           THE COURT:  Thank you.

4           MR. HORAN:  Thank you.

5           MR. ABELMAN:  Thank you, Your Honor.

6           I want to be clear that Triangle is T-USA's parent,

7    and the officers of Triangle are -- govern T-USA.

8           THE COURT:  Are what?

9           MR. ABELMAN:  The officers of Triangle govern T-USA;

10   they are the people in control of both companies.

11          THE COURT:  Are they officers of both companies?

12          MR. ABELMAN:  I don't know if they're officers of both

13   companies; I do not know the answer to that question.

14          THE COURT:  Then what factual basis do I have to say

15   that officers of the parent control the subsidiary?

16          MR. ABELMAN:  Your Honor, I don't have a factual basis

17   to present to you today.  The -- TPC is the owner of --

18          THE COURT:  I understand it's the parent of the

19   debtor.

20          MR. ABELMAN:  Okay.  Okay.  We maintain that this --

21   well, first of all, I just want you to know the arbitration is

22   scheduled to commence on Tuesday, and this has been a -- there

23   has been a continuing effort by Triangle to avoid the

24   arbitration going forward.  And this is a situation where we

25   have a non-debtor parent who is using the debtor's -- the

1    debtor subsidiary to obtain a stay of litigation against itself

2    by making an indemnity claim against its debtor subsidiary

3    without providing any evidence of the indemnification -- an

4    indemnification agreement.

5          I mean, your question was a good one.  Today, you

6    asked about what was the basis for the indemnification, and we

7    heard that it hasn't even been fully articulated.  There is no

8    -- there is no contract that provides for an indemnification,

9    which is what they base their claim on.

10         With this Court's permission, I would like to spend

11   some time describing the subject matter of the arbitration, and

12   then the applicable case law, as applied to the facts.

13         THE COURT:  Okay.  Not too much, though.

14         MR. ABELMAN:  I think my presentation is certainly

15   less than ten minutes.

16         THE COURT:  Okay.

17         MR. ABELMAN:  By way of background, the Bakken

18   formation in the subsurface of the Williston Basin in North

19   Dakota and Montana is one of the most prolific oil basins in

20   North America.  And oil companies that did not have operations

21   in the Williston Basin wanted to, quickly and inexpensively,

22   enter the oil shale play in the basin by partnering with

23   companies that had existing operations.

24         In 2009 and 2010, Slawson was one of the leading

25   Bakken operators, with more than 20 years of experience in the

1    region, and was among -- was a low-cost operator.  So Slawson

2    structures its partnerships to fit the geophysical and economic

3    conditions of a particular location in the market.

4         And since the Williston Basin was becoming very

5    competitive, and because Slawson held vast leases there,

6    Slawson required cost premiums from companies and investors who

7    wished to partner with Slawson in the exploration and

8    development of areas within the basin.  Slawson refers to those

9    premiums as "promotes," so you'll hear more about what

10   "promotes" are.  And they come in various forms, and they're

11   very common, common practice in the exploration and development

12   agreements.

13        So Slawson began to seek partners to develop the oil

14   fields within the area, which is referred to as "Project X."

15   Triangle was a Williston Basin outsider, and had sought to

16   partner with Slawson to explore and develop mineral resources

17   in the Project X area of mutual interest.

18        Triangle became one of Slawson's partners by entering

19   into an exploration and development agreement, effective

20   January 15th, 2010.  The exploration agreement provided, among

21   other things, that Triangle must pay its share of well costs,

22   plus the promote, which was an additional ten percent of the

23   well cost get paid to Slawson for each well that Triangle

24   participated in, in the Project X area.  So that's, again, the

25   ten percent promote.

1          THE COURT:  Okay.

2          MR. ABELMAN:  So this allowed -- this agreement

3    allowed Triangle to obtain a significant presence in the

4    Williston Basin.

5          To this, over time, Triangle became the record holder

6    of a number of a number of Project X leases, and made elections

7    to participate without informing Slawson of its leases.  To

8    this day, Triangle has refused to provide Slawson with a list

9    of those Project X wells that Triangle has participated in.

10          On March 4th, 2011, Triangle and Slawson entered into

11    a purchase and sale agreement, pursuant to which Triangle

12    agreed to pay 6,000 per acre for a 70 percent working interest

13    in various leases.  In that purchase and sale agreement,

14    Triangle, again, recognized and left undisturbed the provisions

15    of the exploration agreement, which provide for the 10 percent

16    promote.

17          Slawson believes that Triangle has participated in

18    numerous wells drilled in the Project X lease area, perhaps as

19    many as 200 or more.

20          THE COURT:  All right.

21          MR. ABELMAN:  We still don't know.

22          THE COURT:  I don't need all of the details of your

23    claim against Triangle.  And I assume, by "Triangle," you mean

24    the parent.

25          MR. ABELMAN:  The parent.  I'm referring to --

1            THE COURT:  Okay.

2            MR. ABELMAN:  -- "Triangle" as the parent and "T-USA"

3    as the debtor.

4        (Pause in proceedings)

5            MR. ABELMAN:  And so the arbitration is about four

6    elements:  A party claiming breach of contract in Colorado must

7    show --

8            THE COURT:  I don't need all of that.  You're suing

9    Triangle for breach of contract.

10           MR. ABELMAN:  Okay.  Your Honor, I do think a few of

11   these items are useful for --

12           THE COURT:  Okay.

13           MR. ABELMAN:  -- for context.

14           THE COURT:  All right.

15           MR. ABELMAN:  The arbitration is scheduled to commence

16   on Tuesday.  The parties have agreed to a bifurcation.  So the

17   liability portion is next week; the damages portion is in mid-

18   December.  Slawson has already expended significant resources

19   to prepare for the arbitration; presumably, Triangle has, as

20   well.

21           The arbitration seeks recovery only from Triangle.

22   It's a simple breach of contract theory against Triangle.  Both

23   contracts were executed, and the contracts were the

24   exploration/development agreement and the purchase and sale

25   agreement.  Only Triangle executed those agreements.  T-USA was

1    not a party to those agreements.

2         The finding of the arbitrator has no collateral

3    estoppel nor *res judicata* effect on any of the claims in

4    litigation before this Court.  The arbitration is -- the

5    arbitration rules don't even require the arbitrator to make a

6    written finding, so there may not be a written finding of law

7    or a written finding of fact in the arbitration.

8         In addition to that, as our pleadings have indicated,

9    we have waived any rights we may have had to assert  the

10   collateral estoppel in the context of claims litigation before

11   this Court.

12        THE COURT:  Okay.

13        MR. ABELMAN:  Your Honor, the case law on extending

14   the stay is pretty well-established here, including your

15   opinion in Uni-Marts, in 2009.  And if I may remind you, that

16   dealt with a director of a debtor attempting to extend the stay

17   for, among other reasons, the fact that the debtor indemnified

18   him as an officer.

19        And in that opinion, you quoted McCartney v. Integra

20   National Bank, which is a Third Circuit case, and you noted:

21             "As a consequence, it is universally acknowledged that

22             an automatic stay of proceedings accorded by Section

23             362 may not be invoked by entities such as sureties,

24             guarantors, co-obligors, or others with a similar

25             legal or factual nexus to the debtor."

1        You went on to say:

2        "Courts may extend the automatic stay to non-debtor

3        third parties if unusual circumstances are present."

4        You noted that:

5        "The purpose secured by extending the stay to the

6        party indemnified by the debtor must be consistent

7        with the purpose of the stay itself to suspend actions

8        that pose a serious threat to a corporate debtor's

9        reorganization interest."

10       Here, T-USA's pleadings do not even invoke the serious

11   threat or the unusual circumstances.  We have no evidence that

12   the arbitration -- there is no evidence of an actual

13   indemnification agreement; and even if there was, as I said

14   earlier, the -- there is no collateral estoppel effect in this

15   situation.

16       Also, the unsecured claim portion, the prepetition

17   unsecured claim portion is -- that was stated in our proof of

18   claim, is 9.4 million.

19       To the extent that that claim -- to the extent that an

20   indemnification claim can even be invoked by Triangle against

21   T-USA, Your Honor, that claim may, as a parent, be subordinated

22   or waived.  We don't know yet because we haven't seen a plan of

23   reorganization.

24       The other case that impinges upon this issue from this

25   district is the W.R. Grace case.  And in that case, the Court

1    cited two factors, which are consistent with your opinion.  It

2    said:

3           "Whether the non-defendant and defendant share an

4           identity of interest, such that suit against a non-

5           defendant is essentially suit against the defendant,

6           and whether the third-party action will have an

7           adverse impact upon the defendant's ability to

8           reorganize."

9           Your Honor, we submit that the fact -- those factors

10   are not met here.  Again, the suit -- the arbitration against T

11   -- against Triangle is not -- does not involve a direct claim

12   against T-USA.

13          The legal basis for the claims are entirely different.

14   The legal basis for the arbitration is a breach of contract

15   against Triangle.  That's not the legal basis, there is no

16   contract between Slawson and T-USA.  And to the extent that

17   there are -- that there is a claim, it's a different forum that

18   will decide that.  To the extent that there is an objection

19   filed against -- filed by T-USA to Slawson's proof of claim,

20   that, of course, will be heard in the context of any claims

21   administration before this Court.

22          THE COURT:  What is Slawson's basis for its proof of

23   claim against the debtor?

24          MR. ABELMAN:  The -- it relates to the contracts

25   between Triangle and its subsidiary.  And we don't have all the

1    contracts, so we don't know precisely what that basis would be.

2    We filed a proof of claim as a matter of -- to preserve any

3    claim, to the extent that the debtor assumed this obligation as

4    part of the assignment of leases.  So, at this juncture, we

5    don't know that there was that type of assumption.

6          THE COURT:  I understand.  Okay.

7          MR. ABELMAN:  Your Honor, I want to make a few more

8    points.

9          Contrary to T-USA's pleadings, Slawson's proof of

10   claim does not assert a theory of joint and several liability.

11   And the arbitrator has already determined that T-USA is not an

12   indispensable party, is not a real party of interest in the

13   arbitration.  The arbitrator has determined that, with regard

14   to the claims before the arbitrator, the arbitrator can proceed

15   and adjudicate those claims against T -- against Triangle,

16   period.

17         On Page 6 of T-USA's motion, it says:

18         "The Triangle/T-USA assignments show on their face

19         that Triangle did not transfer to T-USA the

20         obligations to make the ten percent payment."

21         If that's the case, that will be a defense that's

22   raised in the context of claims litigation, and the

23   determination in the arbitration will have no bearing on that.

24         Your Honor, we hope that you will see that this

25   indemnification claim is a somewhat clever mechanism by the

1    parent to gain the benefits and protections of the Bankruptcy

2    Code without the attendant obligations.  Thank you.

3            THE COURT:  Thank you.

4            MR. DRESSEL:  Thank you, Your Honor, if I could just

5    respond briefly on a few points.

6            I think, at the outset, to address the point that --

7    or at least the implied point that TUSA was directed to file

8    this motion by its parent company, that isn't true, Your Honor.

9    Both companies have implemented corporate governance

10   arrangements to address issues like this.

11           TUSA's decision-making, ultimately, with respect to

12   this issue is determined by TUSA's independent direct.  There

13   is some, but not complete overlap among certain managers of

14   both businesses.  But any executive officer who has an

15   affiliation with both TPC and TUSA has recused himself or

16   herself from any decision-making with respect to this matter,

17   and generally, with respect to any matters in this process,

18   where there is this particular issue between TPC and TUSA.  So

19   TUSA filed this motion, acting out of its own interests, and

20   believing that allowing this arbitration to proceed would be

21   prejudicial to its own reorganization process.

22           And that brings me to the second point I want to make:

23   What is the basis for the claims from TPC -- of TPC against

24   TUSA?  You know, as I think we said in our papers, there is --

25   there was an assignment of the leases.  There was no express

1   assignment of leases, I'm aware of, of the actual promote

2   obligation.

3         But nonetheless, there is an allegation by both

4   parties in their proofs of claim that, irrespective of whether

5   there is an express contractual assignment, there is an implied

6   assignment or an assignment under the theory that, by assigning

7   the leases, you have also assigned the obligations that are

8   alleged to run with the leases, and so there is a claim on that

9   basis.

10         And what does that mean for TUSA, in terms of the

11   arbitration going forward?  Counsel argues, he says there's no

12   effect on TUSA because TUSA is not a party and won't be bound.

13   I think two points:

14         First of all, while Slawson may have waived collateral

15   estoppel, TPC has not, and may assert it in this court.  And as

16   I said in my initial presentation, it s not at all clear that

17   it could not do so successfully.  We would defend it, but if

18   the contours of the doctrine give rise to some nuance, that

19   would have to be litigated.

20         In addition, even if TUSA could rebut an argument of

21   collateral estoppel, it doesn't change the fact that what TUSA

22   might be defending in this Court is an indemnification claim

23   against TPC.  And that's significant because, in connection

24   with a defense of an indemnification claim, TUSA would not, in

25   any circumstance, I believe, be permitted to litigate the

1   underlying merits of the claim.

2          So, in other words, TUSA could argue that there is no

3   valid claim of indemnification, there is no indemnification

4   obligation.  But it wouldn't have an opportunity in this court

5   to allege that the actual scope of the promote obligation is

6   different than what the arbitrator adjudicated.

7          So, if the arbitrator issued, hypothetically, a five-

8   million-dollar award against TPC, and TPC turned around and

9   asserted a five-million-dollar indemnification claim in this

10  court, TUSA can say, there is no indemnification obligation.

11  But I do not believe that TUSA is likely to succeed by saying

12  the arbitrator was wrong, it's only a 2.5-million-dollar

13  underlying claim.  That's not how indemnification claims are

14  litigated.

15         So it goes back to the same point, that there is a

16  litigation that is about to proceed, that TUSA's activities are

17  central to.  It could seriously implicate TUSA, and it could

18  lead to substantial proofs of claim in this proceeding that

19  TUSA would not have an adequate opportunity to litigate on the

20  merits, to the detriment of all its stakeholders taken

21  together.

22         With that in mind, unless Your Honor has any specific

23  questions, I'll conclude my presentation.

24         THE COURT:  No.  Thank you.

25         MR. DRESSEL:  Thank you.

1          (Pause in proceedings)

2          THE COURT:  Well, let me make my ruling.  First, with

3     respect to whether the automatic stay applies, I agree with the

4     arbitrator; the automatic stay is not applicable.  The debtor

5     is not a party to it, and that is clear from Third Circuit law,

6     that the automatic stay does not apply to non-debtors.

7          The question is whether it can be extended to non-

8     debtors, and that depends, as the parties correctly articulate

9     the standard, whether there's an identity of interest between

10     the debtor and the other party, such that a judgment against

11     the other will, in effect, be a judgment against the debtor,

12     and whether the action will directly affect the debtor's assets

13     or its ability to reorganize.

14          With respect to the identity of interest, I think that

15     the two claims, the claim of Slawson against TPC, and the claim

16     against -- of Slawson against the debtor, are different,

17     legally and factually.  The one is a contractual one against

18     TPC, and based solely on the contracts between Slawson and it.

19          The other depends on a finding that there was an

20     implied assignment of the obligations under those contracts.

21     And while it may depend on whether there is an underlying

22     contractual obligation, the determination of whether the debtor

23     is liable for that depends on different legal and factual

24     issues.

25          And I do note that the debtor has taken the position

1     that there was not a formal assignment of those obligations,

2     and it will depend on whether there was an implied assignment.

3          But I think that the claims are different.  Although,

4     as I say, the claim against the debtor depends on whether there

5     is, in the first instance, a claim against TPC.  And that

6     implicates the second standard, whether the action will

7     directly affect or threaten the debtor's assets or its

8     abilities to reorganize.

9          While the debtor contends that this potential

10    arbitration that is to proceed next week is interfering with

11    its ability to reorganize because it has milestones by which it

12    must file and pursue its plan of reorganization, the debtor

13    readily admits that, because of the Slawson claim, it needs to

14    be decided, either in a claim objection process or in an

15    estimation process, in order for its plan of reorganization to

16    proceed to confirmation.  And quite frankly, I think the best

17    way to determine that claim is to let the underlying claim be

18    decided first, and that is, to let the arbitration proceed.

19         If TPC wins in the arbitration, then it has no

20    indemnity claim against the debtor.  And any claim of Slawson

21    against the debtor may also go away because it is premised on

22    an applied assignment of that obligation.

23         This is not a situation that we often have, where

24    there is no one to defend the action.  It appears that TPC is

25    prepared to actively contest the contractual claims that

1    Slawson is bringing.  And really, it's logical to assume that

2    it will use its best efforts to defend against that because its

3    indemnification claim, even if not subordinated, may,

4    nonetheless, only get cents on the dollar from the debtor,

5    while it has to pay Slawson 100 percent of any claim against

6    it.

7         I think the debtors' arguments that it may have to

8    defend these claims is lessened if we have a decision on the

9    underlying claim of Slawson against TPC.  So I am going to deny

10   the motion to extend the stay.

11        MR. DRESSEL:  Thank you, Your Honor.  We'll submit a

12   form of order consistent with Your Honor's ruling.

13        THE COURT:  Okay.

14        MR. DRESSEL:  As a housekeeping matter, Your Honor, we

15   filed a reply Monday evening, and there was a motion to file

16   (indiscernible) if Your Honor would like, we have a form of

17   order.

18        THE COURT:  Do you have a form of order handy?

19        MR. DRESSEL:  I do.

20        THE COURT:  I did not sign that yet, and I will.

21   Thank you.

22     (Pause in proceedings)

23        THE COURT:  All right.  I thank the parties for their

24   briefing and argument.  And we'll stand adjourned.

25        MR. ABELMAN:  Thank you, Your Honor.

1              MR. DRESSEL:  Thank you, Your Honor.

2              COUNSEL:  Thank you.  Thank you, Your Honor.

3         (Proceedings concluded at 12:14 p.m.)

4                          *****

1                          <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and ability.

5

6

7

8    <u>/s/ Coleen Rand                </u>          November 11, 2016

9    Coleen Rand

10   Certified Court Transcriptionist

11   For Reliable